IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,415

STATE OF KANSAS,
*Appellee*,

v.

CHARLES C. LOGSDON,
*Appellant*.

SYLLABUS BY THE COURT

1.

An appellate court reviews a sufficiency of the evidence challenge by looking at all of the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.

2.

An appellate court does not reweigh the evidence or evaluate the credibility of witnesses, as these functions are left to the jury.

3.

A conviction of even the gravest offense may be sustained by circumstantial evidence. Circumstantial evidence, in order to be sufficient, need not rise to that degree of certainty which will exclude any and every other reasonable conclusion. Instead, circumstantial evidence affords a basis for a reasonable inference by the jury regarding a fact at issue.

1

4.

A district court may order a mistrial at any time if it is necessary as contemplated by K.S.A. 22-3423, including if there is prejudicial conduct, in or outside the courtroom, making it impossible to proceed with the trial without injustice to either the defendant or the prosecution. In making this determination, the district court must engage in a two-step process: first, it must determine if there is a fundamental failure in the proceeding; if so, second, the district court must determine whether it is possible to continue the trial without an injustice. In the mistrial context, an appellate court asks whether the district court abused its discretion at either of these two steps.

5.

An appellate court reviews a district court's decision denying a motion for mistrial for abuse of discretion. In general, a district court abuses its discretion by issuing an order that is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.

6.

Evidentiary errors will not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial.

7.

Under Kansas Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41), an appellant's brief must include pinpoint citations to the record on appeal where an issue was raised and ruled on in the district court. Alternatively, there must be an explanation why the issue is properly before the court despite not having been raised in the district court proceedings.

8.

A failure to adequately brief an issue results in abandonment or waiver of the issue.

9.

In the context of an issue about a jury instruction, the invited error doctrine does not apply to a party who objected at trial to the instruction. Unless the error is structural, the invited error doctrine applies only when the party both fails to object and invites the error.

10.

Even if the declarant of an out-of-court statement is present at an evidentiary hearing and expected to testify, K.S.A. 2015 Supp. 60-460(a) does not exclude the declarant's statements from the general definition of hearsay if the declarant is still protected by his or her privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

11.

In order for the coconspirator hearsay exception of K.S.A. 2015 Supp. 60-460(i)(2) to apply: (1) the person testifying must be a third party; (2) the out-of-court statement must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been made while the conspiracy was in progress; and (4) the statement must be relevant to the plan or its subject matter.

12.

The Sixth Amendment to the United States Constitution guarantees that, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the

witnesses against him or her. This right is violated if an unavailable declarant's testimonial statements are brought into evidence against the accused without a prior opportunity to cross-examine that declarant.

13.

The threshold question in determining if the admission of evidence violates an accused's Sixth Amendment right to confront witnesses is whether a hearsay statement is testimonial.

14.

Informal statements to friends and acquaintances are generally not testimonial for purposes of the Sixth Amendment to the United States Constitution.

15.

Generally, hearsay statements of an accused's coconspirators are not testimonial.

16.

In considering a motion for mistrial, the degree of certainty by which a court must be persuaded that the error did not affect the outcome will vary depending on whether the fundamental failure infringes upon a right guaranteed by the United States Constitution. If it does not, the district court should apply K.S.A. 2015 Supp. 60-261 and K.S.A. 60-2105 to determine if there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record. If the fundamental failure does infringe upon a right guaranteed by the United States Constitution, the district court should apply the constitutional harmless error analysis defined in *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), in which case the error may be declared harmless where the party benefitting from the error proves beyond a

4

reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* proves there is no reasonable possibility that the error affected the verdict.

17.

Regardless of whether an error is constitutional, one factor to be considered in ruling on a motion for mistrial is whether any damage caused by the error can be or was removed or mitigated by admonition, instruction, or other curative action.

18.

An appellate court reviewing the second step of a mistrial analysis by examining whether an injustice has occurred will review the entire record and use the same analysis, applying K.S.A. 2015 Supp. 60-261 and K.S.A. 60-2105 or else *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), depending on the nature of the right allegedly affected.

19.

An appellate court presumes that a jury followed the district court's instructions.

20.

Kansas' sentencing scheme for imposing a hard 50 life sentence in effect in this case, under which the factual findings necessary to impose the enhanced minimum sentence were made by a judge by a preponderance of the evidence rather than by a jury beyond a reasonable doubt, violated defendant's right to a jury trial under the Sixth Amendment to the United States Constitution.

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed April 1, 2016. Convictions affirmed, sentence vacated, and remanded with directions.

*Shanon S. Crane*, of Hutchinson, argued the cause and was on the brief for appellant.

*Keith E. Schroeder*, district attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.:  A jury convicted Charles Logsdon on seven counts stemming from the death of Jennifer Heckel:  intentional first-degree murder, felony murder, conspiracy to commit first-degree murder, conspiracy to commit aggravated robbery, aggravated burglary, criminal possession of a firearm, and aggravated intimidation of a witness. The district court imposed a life sentence with a minimum term of 50 years (hard 50 life sentence) for the intentional first-degree murder conviction. Logsdon now appeals, asking us to reverse his convictions and vacate his hard 50 life sentence.

For reasons we will more fully explain, we uphold Logsdon's convictions because his arguments on appeal are ultimately nonmeritorious. First, viewing the evidence in the light most favorable to the State and deferring to the jury's credibility conclusions—as we must do on appeal—there is sufficient evidence supporting his convictions. Second, the district court did not err in denying Logsdon's motions for a mistrial (which were based on the admission of certain hearsay evidence). The court took effective remedial action to prevent the jury from considering some hearsay. And the remaining hearsay was either not objected to or was admissible under at least one hearsay exception. None of the hearsay statements violated Logsdon's constitutional right to confront witnesses. Third, we reject Logsdon's argument regarding a jury instruction on aiding and abetting liability because, even assuming the instruction was erroneous, he invited any error by requesting it.

6

Although we affirm Logsdon's convictions, we must vacate Logsdon's hard 50 life sentence and remand for resentencing. As the State concedes, Logsdon's hard 50 life sentence was improperly imposed in light of the United States Supreme Court's decision in *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), and our application of that decision in *State v. Soto*, 299 Kan. 102, Syl. ¶ 9, 322 P.3d 334 (2014), and *State v. Warren*, 302 Kan. 601, 622-23, 356 P.3d 396 (2015).

FACTS AND PROCEDURAL HISTORY

Logsdon's lengthy trial involved numerous witnesses and thousands of pages of transcript. We offer a condensed version of the facts, as they were established at trial, but still must discuss the evidence in some detail because of Logsdon's sufficiency of the evidence challenge.

A. *The crime and initial investigation*

Trial testimony established that Heckel was shot in her home around 7:00 p.m. on June 14, 2011. Her 5-year old son, T.H., was home at the time and ran to his neighbors for help. Emergency responders found Heckel slumped on the floor in her kitchen and, after lifesaving measures were attempted, declared her dead at the scene.

At trial, T.H. testified he was sitting in his playroom watching television. During a commercial, he went to the window and saw someone come up to the house. He heard someone else in the house with his mother and heard several loud bangs, but he did not see anything because he stayed in his playroom until he heard the kitchen screen door shut. Although T.H. could not recall any additional details at trial, law enforcement

7

officers testified that right after the shooting T.H. had told them he saw a red car pull into the driveway with possibly two people in it and he saw a man run out of the house.

A total of four shots were fired inside the Heckel home: one shot went through a food container in the kitchen, through a window, and outside (and was never recovered); one grazed Heckel's side and was found imbedded in a kitchen wall; one was found under her body and probably caused her chest wound; and one was fired at the back of Heckel's head and found near her neck. Heckel's wounds were caused by medium-caliber bullets. Expert witnesses opined that the shots were probably fired from relatively close range, but no one was able to conclusively determine their sequence.

Neither the Kansas Bureau of Investigation (KBI) nor the Hutchinson Police Department found any relevant fingerprint, DNA, or trace evidence. Of note, investigators found two cigarette butts outside the house, but the cigarettes yielded no DNA match to any suspect. Nor did investigators initially discover any evidence of motive. Further, as members of the Hutchinson Police Department testified at trial, every person of interest among Heckel's family, friends, and acquaintances had an alibi. As a result, the police began to investigate whether someone other than Heckel was the intended target.

To this end, police began canvassing the streets and questioning people known to be involved in home invasions, daytime burglaries, and drugs. The first break in the case came on June 30, 2011, when Detective Dean Harcrow interviewed Billy Craig. According to Detective Harcrow's trial testimony, Craig told him he had heard "someone had been shot in the head." This same statement was also introduced through the testimony of Lieutenant Martin Robertson, who was not present during the exchange but recounted what Craig had told Detective Harcrow. This particular statement was

8

important to the investigation. As both Lieutenant Robertson and Detective Harcrow explained, Craig's comment told them they were on the right track because that particular detail of the shooting had not been released to the public.

Logsdon timely made a hearsay objection to both witnesses' testimony about Craig's statements. See K.S.A. 2015 Supp. 60-460 (A statement constitutes hearsay evidence if it "is made other than by a witness while testifying at the hearing [and is] offered to prove the truth of the matter stated . . . ."). Hearsay evidence is generally inadmissible unless a specific exception applies or the evidence is otherwise excluded from this general definition. As relevant to the rulings, the State argued Craig's statements were excluded from the definition of hearsay because the State planned to have Craig, who was in custody, testify. The State pointed to K.S.A. 2015 Supp. 60-460(a), which allows admission of "[a] statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter." The district court overruled Logsdon's objection.

Later in the trial, however, Craig refused to testify, leading the district court to admonish the jury to "disregard the testimony regarding the statements of Billy Craig that were specifically made during the testimony of . . . Detective Dean Harcrow, regarding a meeting on June 30 with Billy Craig only." The instruction did not mention Lieutenant Robertson's testimony about Craig's statement.

After Craig revealed information that would only have been known by someone involved in the crime or an investigator, police began interviewing people with whom Craig was associated. Eventually law enforcement concluded that warring groups of drug users, who often robbed each other and did not report the robberies to the police, were linked to Heckel's death.

9

B. *Testimony from witnesses associated with Craig or Logsdon*

Most of the evidence admitted at trial against Logsdon came from various members of Craig's circle. There were credibility concerns. Many, if not most, of these witnesses received some sort of benefit in exchange for their testimony against Logsdon. Almost all of them had unrelated criminal cases pending or were in jail on unrelated criminal charges. Several admitted they were reluctant to testify, and some witnesses were held in contempt of court before eventually agreeing to take the stand. A handful of the other witnesses called to testify against Logsdon were alleged, by other witnesses, to have somehow been involved in Heckel's death. Indeed, at the time of Logsdon's trial, Craig was charged with the first-degree murder of Heckel and conspiracy to commit first-degree murder. See generally *State v. Craig*, No. 110,466, 2014 WL 2871395 (Kan. App.) (unpublished opinion), *rev. denied* 300 Kan. 1105 (2014).

Logsdon called these witnesses' credibility into question at trial. We will discuss these credibility issues more thoroughly later in our opinion, but we mention them here because they provide context for understanding the State's case against Logsdon.

1. Conspiracy to rob Kayla Rodriguez

Once investigators began to focus on Craig's circle of friends, they learned of a conspiracy to rob someone *other than* Heckel—Kayla Rodriguez, a woman involved in the drug trade who sold drugs to Craig and others.

Several witnesses testified at trial regarding Logsdon's involvement in a couple of different plans to rob Rodriguez. Kara Kylie Branton admitted at trial that 3 to 4 weeks

10

before Heckel's death, she, Craig, and Logsdon were involved in the original plan. Branton testified she became afraid when Logsdon proposed using guns, and she sent word of the plan to Rodriguez. Afterwards, according to Branton, Logsdon called her cussing and screaming because she had ruined the plan.

Rodriguez testified at trial that after she learned of the plan to rob her, she was reluctant to go to Craig's house if Logsdon was there. When she asked Craig about the plan to rob her, Craig assured her that as long as he was around nothing bad would happen to her. Logsdon lodged a hearsay objection, which was overruled.

There was also evidence of a second plan to rob Rodriguez. According to law enforcement testimony, Leonard Hill told the KBI that he too was involved with a planned grab-and-go robbery of Rodriguez—and this plan was between himself, Logsdon, and Craig.

Other testimony described a plan without mention of Hill's involvement, suggesting there was at least a third plan, and it is this plan the State believed led to Heckel's death. The State introduced evidence of this last plan through a variety of witnesses, including one who had been incarcerated with yet another woman in Craig's circle, Kylie Hartman. Hartman told her fellow prisoner that the final plan involved herself, Logsdon, Craig, and two others—Matt Barnes and Jason Casanova.

In addition to evidence about Logsdon being involved in plans to rob Rodriguez, other evidence implicated Logsdon in efforts to obtain a gun. One witness testified at trial that sometime prior to Heckel's murder (the timeline is not clear from testimony, but the evidence suggests it was in the spring of 2011), Logsdon asked him if he knew where he could get a gun. A second witness testified that before Heckel's murder on June 14, 2011,

11

Logsdon and Branton came to his house and Branton asked about purchasing a firearm, as she and Logsdon needed it for a robbery they were trying to commit against someone named "Kayla" or "Kayley"—which would fit with evidence of a plan to rob Kayla Rodriguez. This second witness then denied Branton gave him any specific reason for needing a gun, but he stated Branton tried to sell him a gun after Heckel's murder. He never saw the gun but thought it might have been a .22 caliber rifle.

    2.  Heckel's murder

Trial testimony was in conflict as to why anyone—whether it be Logsdon, Craig, Branton, Hartman, Hill, Barnes, or Casanova—wanted to rob Rodriguez. A few witnesses suggested it was because she owed money to Craig or a Wichita drug cartel. Rodriguez, however, stated it was Craig who owed her money. Another witness floated a theory involving Social Security fraud. Logsdon told KBI agents that the plan was part of a paid hit. Of relevance to Logsdon's appeal, Hartman testified at trial, over Logsdon's hearsay objection, that she had heard Craig mention Rodriguez' debt a few times, and Craig would occasionally rant and rave about it, like he did about a lot of things.

Regardless of the motive for the robbery, several witnesses testified they had heard Heckel's shooting was a mistake. Logsdon also told KBI agents after his arrest that Craig had told him the wrong person was killed. At least two theories about such a mistake emerged at trial.

First, investigators considered whether Heckel's death was a case of mistaken identity. A law enforcement officer testified Heckel "could have been mistaken for Rodriguez" but only if a person did not know either woman. This theory was somewhat undermined at trial, as Rodriguez and others testified Logsdon, Hartman, and Craig knew

12

what Rodriguez looked like; Hartman even had a Christmas card photograph of Rodriguez. Logsdon initially denied knowing Rodriguez, but he later told police he had seen her at Craig's house.

Second, some evidence suggested the shooter knew who to look for but went to the wrong house. At least one witness briefly mentioned having heard that Heckel and Rodriguez had similar house numbers but lived on different streets. Other witnesses mentioned this theory in a little more detail. For example, a witness who had been incarcerated alongside Hartman testified that Hartman told her she, Craig, Logsdon, Barnes, and Casanova met one evening to talk about going over to Rodriguez' house. This witness testified Hartman had said Craig then drove the men to the house and Logsdon and Barnes committed the actual murder. Hartman also told the witness she was not involved in the murder and was "freaking out" when she learned the men had gone to the wrong house and shot the wrong woman. Yet another witness testified Hartman told her Logsdon shot Heckel and they had "got the wrong house." Logsdon stated in a letter from jail, however, that Craig both knew what Rodriguez looked like and where she lived.

3. After Heckel's death

After Heckel's murder, Branton—who was, as we mentioned above, involved in the first plan to rob Rodriguez—testified Logsdon left town. Logsdon called Branton and asked her what she was hearing about the shooting. He specifically asked whether Craig was "telling stuff about him." According to Branton, Craig also made a comment along the lines of "everyone was turning bitch on him." When she asked Logsdon if he was involved in Heckel's murder, Logsdon told Branton he "stayed up eight days too many and that he shot her."

Hartman testified that she too left the state after Heckel's murder to care for her injured child. She spoke with police via phone in July 2011. In her testimony, she admitted that after speaking with the police she called Casanova and told him to remove any bullets that might be around her house; she explained this had nothing to do with Heckel's murder but was because she was a convicted felon. Casanova testified he remembered Hartman calling to do a clean sweep of her house, but he told the jury he thought he was just cleaning the house because it was a mess. Casanova implied at trial that he found a gun *outside* Hartman's house. When the State asked if he threw it away, he said he was going to "plead the Fifth." Despite Casanova's cleaning, the police recovered bullets from Hartman's house.

Hartman acknowledged hearing from someone on the street that Casanova had made a smart aleck remark about getting "rid of that handgun that killed that girl." But Hartman denied hearing this statement directly. She explained that all she knew about Heckel's death she had learned on the street—and those stories changed a lot; she had heard probably 50 theories about the murder. Hartman repeatedly denied having anything to do with Heckel's murder.

Yet another witness offered testimony about conversations she had with Hartman and Branton. According to this witness, Hartman once made a comment—knowing she was a suspect in the case—that she got her hair cut so that it looked less like a "murderess' haircut." This witness also testified that Hartman did not think Craig would give her up to the police and that Craig was protecting her. This witness further stated that Branton called her several days after Heckel's death to say Logsdon had left the state and had told her he had shot and killed Heckel. According to this witness, Branton gave no other specifics about Heckel's death other than that Logsdon was scared.

A different witness testified Hill came to her house about a week after Heckel's murder and let slip that Logsdon shot Heckel in the face—information she passed on to the police. Hill, who also testified, denied making this statement. Another witness testified he told the police both Logsdon and Hill paid him a visit the day after Heckel's murder and Hill was acting "real crazy" and said Logsdon shot Heckel in the back of the head.

Another witness, David Crothers, testified that the day after the murder he ran into Craig; he later told Detective Bryan Rodriguez about what he had heard. Crothers testified Craig said, "[I]f he had anything to do with it he'd make sure that everybody was killed." Detective Rodriguez corroborated that Crothers had told him about Craig's statements involving Heckel. Detective Rodriguez further testified that Crothers told him Craig said he knew who shot Heckel and it was Logsdon. The district court initially overruled Logsdon's hearsay objections to Crothers' and Detective Rodriguez' testimony on the grounds that Craig would be available as a witness. But when Craig refused to testify and the district court admonished the jury to disregard some testimony about Craig's statements, the district court specifically directed the jury to disregard the testimony of both these witnesses.

As for Logsdon, he left Hutchinson for Nebraska approximately 2 weeks after Heckel's death. He told people, however, including Detective Harcrow in a July 11, 2011, telephone conversation initiated by Logsdon, that he was in Texas. A police officer testified Logsdon was arrested without incident on August 5, 2011. Police recovered several firearms from a locked gun cabinet in a bedroom in the Nebraska house. The gun cabinet was not in Logsdon's bedroom and the homeowner, not Logsdon, unlocked the

15

cabinet for the police. Investigators focused on two firearms—a Smith and Wesson .357 handgun and a Colt .38 revolver with the serial number removed.

Through later testing and comparison to the bullets found in Heckel's house, KBI investigators were able to exclude the Smith and Wesson .357 handgun. They were unable to exclude the Colt .38 revolver. A KBI forensic examiner testified this meant it was equally likely that the Colt .38 revolver fired the bullets as that it did not. The parties stipulated Logsdon was a felon and was prohibited from possessing a firearm.

C. *Logsdon's statements to police*

Logsdon's own statements to the police were also admitted at trial through various law enforcement officers. One statement came in when Detective Harcrow testified about the July 11 phone conversation Logsdon had initiated. During this call, Logsdon mentioned several people who might have been involved in the crime, including Craig, Branton, Barnes, and Casanova. He also mentioned rumors he had heard about a conspiracy to rob Rodriguez.

On August 6, 2011, the day after Logsdon was arrested in Nebraska, he began his interview with officers by stating he did not know anything about the Heckel case. Nevertheless, Logsdon told the officers certain things that had not been released to the media. For example, Logsdon threw out the idea, unprompted, that a red car might have been involved; he later told police that Craig drove to the Heckels' house in a red Cadillac. When a KBI officer said Craig did not own a red Cadillac on the day of the murder, Logsdon disagreed. Further investigation revealed that Craig indeed had owned two red cars. One was a red or maroon Cadillac that he owned for only a week. And during that week, a witness testified he had repeatedly asked Craig if Craig would sell the

Cadillac. Craig refused. But a few days after Heckel's murder, Craig said he was willing to sell.

Logsdon also suggested someone went to the wrong house, and he listed several people as possible suspects—including Craig, Hartman, Branton, Barnes, and Casanova. The police were not yet investigating some of these people. Logsdon denied knowing Barnes but then kept giving little bits of information about him (and later stating that he had heard Barnes was "the trigger man"); Logsdon also, in later interviews, said he had never been with Casanova in his life, which differed from his statements in earlier interviews. Finally, Logsdon told police Heckel was shot in the head—a detail that had still not been publically released—and Logsdon also said he knew for a fact that Craig knew who shot Heckel. Originally Logsdon claimed only to have heard of Craig's involvement; in later interviews Logsdon asserted Craig told him he was the driver and once said Craig had gone inside the Heckels' house.

Logsdon mentioned firearms several times in his postarrest interviews with police. He varyingly stated:  Craig was supposed to give him a rifle but never did, he actually was in possession of a rifle and tried to trade it for a pistol or other handgun, Craig gave him a rifle, and either Branton or Hartman gave him a rifle.

Of note, Logsdon always adamantly denied shooting Heckel. But during one interview, when a KBI agent suggested Heckel was killed because someone panicked, Logsdon responded that he did not panic. Logsdon also told the agent he had provided 85 percent of the truth, and, when asked for the rest of it, said the remaining 15 percent would incriminate him.

D. *Logsdon's statements to other inmates*

The State also called witnesses who were housed with Logsdon in jail. The trial transcript does not always make clear when the various alleged exchanges between Logsdon and these witnesses actually took place. But the evidence suggests some of Logsdon's alleged statements to these inmates may have been made after he had access to the charging documents, other preliminary filings, and evidence—as opposed to these statements coming from personal knowledge alone.

One witness testified that Logsdon denied killing Heckel but then went on to explain how the crime supposedly happened— Heckel was shot "execution style," two people were involved, and a child was present. Another witness testified he and Logsdon discussed the case and Logsdon asked him legal questions; according to this witness, Logsdon wanted to know how long it took to get results from DNA testing but was not concerned about any DNA evidence specific to him. At some point this witness and Logsdon were involved in a jailhouse fight where, at least according to the witness' subsequent interview with the police, Logsdon said, "I'm going to kill you like I killed that bitch." However, the witness testified at trial he was untruthful with the police and Logsdon never actually made this statement.

The State also presented a video from the jail depicting a conversation between Logsdon and two inmates. One of these inmates testified at trial that Logsdon asked him about various legal issues involving DNA evidence from cigarette butts and discussed different aspects of Heckel's case. According to this inmate, Logsdon demonstrated how Heckel was shot by getting down on his knees and "put[ting] his hands behind execution style and kind of point[ing] somewhere to the back." This inmate testified Logsdon said a handgun was used in the crime but explained he and Logsdon "didn't touch a lot on the

18

gun issue" because Logsdon "was assured that the gun used wasn't going to be found so he wasn't worried about it." This inmate further testified that Logsdon told him Heckel was murdered by mistake and the plan was to rob someone—"Kylie" or "Kaylee"—who was supposed to have drugs and guns.

A second inmate in the jailhouse video testified that Logsdon discussed a cigarette butt with him but changed his story several times—sometimes Logsdon said he left a cigarette behind. According to this second inmate, Logsdon was particularly concerned he might have left a cigarette butt inside the house by Heckel's body. This second inmate testified Logsdon told him that after the murder Craig learned the wrong woman had been shot; he further testified that Logsdon gave him the names of Craig, Hartman, Casanova, and Barnes and said Craig was the driver, Hartman knocked on the door, and a total of three people went inside the Heckels' house.

A third inmate testified at trial that he had conversations with Logsdon while they were in jail together. The inmate stated that Logsdon claimed he had never seen Heckel or been to her house. Yet, when Logsdon later saw a picture of Heckel on television, he said she was not that nice or good-looking, she was overweight, and her house was messy. According to this inmate, Logsdon explained they entered the Heckel home by going through the garage. Logsdon also mentioned something about a gun that was torn apart. Although not entirely clear, it appears this particular conversation occurred during a recess of Logsdon's preliminary hearing. During the preliminary hearing, a video of the inside of Heckel's home was shown. Thus, Logsdon's descriptions of Heckel and her home might have been based on evidence he saw during the hearing. A KBI agent testified this inmate also told him Logsdon had said he was worried his DNA might be found on a cigarette butt at the scene.

A fourth inmate testified Logsdon was upset about facing a robbery charge because nothing was missing from Heckel's home. Specifically, this inmate testified Logsdon had said, "[W]hen I shot that bitch her purse was sitting right there." Indeed, several witnesses testified Heckel's purse was found not far from her body.

E.  *Other evidence*

Not all the evidence at trial came from the testimony of witnesses associated with either Craig or Logsdon. Police uncovered text messages between Craig and Logsdon on July 1, 2011, a couple of weeks after Heckel's murder and right after Logsdon left Hutchinson for Nebraska. Logsdon sent one message to Craig reading, "[T]hey questioned you about a murder? You better talk 2 me" (Logsdon would later tell investigators he did not know what this conversation was about). Police testimony established there had been no murders in Hutchinson for months before Heckel's, there were no other murders in Hutchinson between hers and July 1, and Heckel's murder was the only pending murder investigation with the Hutchinson Police Department at that time.

Logsdon also sent several messages to one of his cousins. One, sent hours after Heckel's death, stated, "I'm goin to prison anyhow." Another, sent on the evening of June 14, 2011, read, "That's how I pay my bills you punk hoe I'm a end up hurtin one of shot one your hoes with this new piece . . . ." A law enforcement officer explained there had been no other shootings in Hutchinson that day or that week that could have been the subject of the message. A few minutes later, Logsdon sent another message that read, "I ain't readin your bullshit you drunk coke head bitch ah kill one of you clowns real talk bitch you fuck with Billy I'm steelin something from you every time you do it watch ya ain't got no love."

Also, Logsdon mentioned the Heckel murder in several letters from jail. In one, he denied having anything to do with Heckel's death and wondered why Craig was speaking out against him. He identified Craig as the driver, Barnes as the shooter, and Hartman and Casanova as the ones who "tore up the gun" afterwards. In another letter, Logsdon again denied involvement and wondered why Craig was lying; he asked the recipient to tell Craig to stop lying or else he would go to the police with his own information. He later did just that: Logsdon wrote to a detective and, while again denying any role in Heckel's murder, stated he wanted to help and would do so if the police could get him out of jail. Specifically, Logsdon wrote that he could help put Craig away and wanted a deal.

### F. *Billy Craig's refusal to testify and Logsdon's motion for mistrial*

As is apparent from these facts, Craig's initial statement about having heard someone was shot in the head turned out to be critical to the investigation because that information, unreleased to the public, led to investigators questioning those associated with Craig. Several of these individuals testified at trial about statements Craig made regarding Rodriguez or the Heckel murder. Again, Logsdon objected to this testimony as hearsay, but the district court overruled the objections because the State planned to call Craig as a witness, making him available for cross-examination. As previously noted, under Kansas law, the other witnesses' testimony about Craig's previous out-of-court statements would be admissible under a hearsay exception if Craig testified. See K.S.A. 2015 Supp. 60-460(a).

Toward the end of trial, however, when the State attempted to call Craig to the stand, the State's plan hit a snag. The State had charged Craig with offenses arising from Heckel's murder, and his attorney notified the district court that he expected Craig to

21

assert his right under the Fifth Amendment to the United States Constitution to not incriminate himself. In light of his refusal to testify, the State provided Craig with derivative testimonial use immunity for his testimony, at which point Craig's attorney advised Craig (despite acknowledging caselaw to the contrary) that the federal government might still prosecute him. The district court informed Craig he could be held in contempt for refusing to testify despite his immunity. Still, Craig refused to testify—he went so far as to explain why a contempt sentence would not make much difference to him or his sentence.

The district court granted Craig's attorney extra time to speak with Craig. The State supported the extra time because of the potential impact on the trial if Craig continued to refuse to testify—for example, the jury would need to be instructed to disregard what it had already heard regarding Craig's prior, out-of-court statements. The district court let Craig think about his situation overnight and, the next day, informed him that in light of his immunity he did not have a Fifth Amendment privilege to refuse to testify. Craig refused to testify, and the district court held Craig in criminal contempt.

Logsdon then moved for a mistrial on the grounds that the admission of Craig's out-of-court statements through other witnesses, when Craig himself did not testify, violated Logsdon's Sixth Amendment confrontation rights. The State insisted it believed in good faith that Craig would testify and that a mistrial was not called for, especially since a limiting instruction could cure any prejudice. The district court denied Logsdon's motion for a mistrial and set the parties to the task of crafting an appropriate admonition for the jury. The court then instructed the jury to disregard all testimony of Crothers and Detective Rodriguez regarding statements Craig had made and to disregard the testimony of Detective Harcrow regarding Craig's June 30 statement. The instruction did not detail

what the June 30 statement was, but the transcript reveals that Craig told Detective Harcrow he had heard about Heckel being shot in the head.

G. *Verdict, posttrial motions, and sentence*

After deliberating over 3 days, the jury found Logsdon guilty of all counts against him: first-degree murder, felony murder, conspiracy to commit first-degree murder, conspiracy to commit aggravated robbery, aggravated burglary, criminal possession of a firearm, and aggravated intimidation of a witness.

Logsdon again moved for a mistrial, and he also moved for judgment of acquittal and a new trial. As relevant on appeal, he argued that several witnesses were permitted to testify about Craig's out-of-court statements even though Craig himself never testified. Without Craig's testimony or other witnesses' testimony about what Craig had said to them, there was insufficient evidence of Logsdon's guilt, according to him. Additionally, he argued the testimony violated his Sixth Amendment confrontation rights. Further, Logsdon disputed whether the State honestly had a good faith belief that Craig would testify.

The district court held a hearing on Logsdon's posttrial motions and eventually denied them. It ruled the State had a good faith basis for believing Craig would testify, and it also held that the curative instruction issued to the jury adequately dealt with testimony about Craig's out-of-court statements. Also, the court concluded a reasonable factfinder could find beyond a reasonable doubt that Logsdon was guilty even excluding the evidence subject to the limiting instruction.

Logsdon elected not to participate at the sentencing stage. At the State's request, the district court imposed a hard 50 life sentence, pursuant to K.S.A. 2015 Supp. 21-6620.

ANALYSIS

Our review is limited to the issues raised by Logsdon, which we have reordered for purposes of our analysis, as follows: (1) Does sufficient evidence support Logsdon's convictions? (2) Did the district court abuse its discretion in denying Logsdon's motion for mistrial, which asserted Logsdon had been prejudiced by the erroneous introduction of out-of-court statements by Craig? (3) Did the district court err in instructing the jury on an aiding and abetting theory? and (4) Must Logsdon's hard 50 life sentence be vacated because it is based on judicial factfinding? We discuss each of these issues in turn below.

ISSUE 1: *Sufficient evidence supports Logsdon's convictions*.

First, we consider Logsdon's argument that no rational factfinder could have found him guilty beyond a reasonable doubt. We note that Logsdon's sufficiency argument is a general one. He does not pinpoint which elements of which crimes he believes the evidence does not support; instead he points to various evidentiary issues which, he contends, show that no reasonable jury could have found him guilty of any of his convictions.

A criminal defendant's challenge to the sufficiency of the evidence amounts to a posttrial claim that the State failed to meet its burden of proving each essential element of one or more charges against the defendant. An appellate court reviews a sufficiency of

the evidence challenge "by looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). In arguing the State cannot meet this standard, Logsdon focuses on discrete evidence. We will first examine the specific evidence discussed by Logsdon and then refocus the analysis on the ultimate standard of looking at *all* the evidence in the light most favorable to the State.

Logsdon first questions the value of the testimony of T.H.—Heckel's 5-year-old son. In particular, Logsdon argues statements by T.H. about seeing a red car during the crime were not credible, considering his age and his initial inconsistent statements about what he saw. Logsdon seems to be arguing that if T.H.'s statements about seeing a red car were taken out of the mix, he would not have been tied to the crime and no reasonable jury would have convicted him. In essence, Logsdon asks us to reweigh T.H.'s testimony. But that is not our role.

Rather, an appellate court "do[es] not reweigh the evidence or evaluate the credibility of witnesses," as these functions are left to the jury. *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011); see also *State v. Van Winkle*, 254 Kan. 214, 225, 864 P.2d 729 (1993) ("On appellate review . . . all questions of credibility are resolved in favor of the State."). The jury was in the best position to evaluate T.H.'s credibility, especially since Logsdon was able to point out T.H.'s inconsistent statements during cross-examination. See *State v. Peoples*, 227 Kan. 127, 135, 605 P.2d 135 (1980) (pointing out the defendant had "an opportunity in closing argument to impress the jury with the circumstantial nature of most of the evidence").

In addition, T.H.'s testimony was not the only circumstantial evidence linking Logsdon to the murder through a red car: Logsdon himself, in his postarrest police interviews, indicated that a red car, driven by Craig, was involved. In fact, when an investigator told him Craig did not own a red Cadillac on the day of the murder, Logsdon's protest led to further investigation that confirmed Logsdon's statement—Craig owned two red or maroon cars at the time, and after the murder he quickly attempted to sell the red Cadillac despite recently expressing a reluctance to part with it. Thus, any issue with T.H.'s testimony does not undermine the evidence about a red car and, more importantly, the sufficiency of the evidence for any of Logsdon's convictions.

Logsdon next argues all the evidence of his involvement in a conspiracy to rob Rodriguez consisted of testimony about what someone told someone else, *i.e.*, hearsay evidence. He contends that, due to witness credibility issues, this evidence was insufficient to show his guilt. We recognize much of this testimony was called into some question on cross-examination and most of the State's witnesses had potential credibility issues: almost all were involved in other criminal cases, several had prior crimes of dishonesty, many hoped to receive some sort of benefit in exchange for their testimony, some were evasive on the stand, and a few were extremely reluctant to testify at all. But Logsdon was able to highlight and address these issues during cross-examination. Despite Logsdon's efforts, the jury believed at least some of these witnesses. Again, we will not supplant the jury's conclusions with our own credibility determinations. See *Hall*, 292 Kan. at 859. The credibility issues Logsdon raises do not show that no reasonable jury would have convicted him.

Logsdon's next argument relating to the sufficiency of the evidence involves his text messages which were presented to the jury, most notably one reading, "I'm a end up hurtin one of shot one your hoes with this new piece." He contends we can only speculate

26

about what this and the other text messages meant, as at most they tended to show he said he might shoot someone in the future. We disagree.

Granted, Logsdon's text messages are not definitive evidence of his guilt and are certainly subject to interpretation. Regardless, a rational jury could have concluded that Logsdon's messages were meant to convey he had *already* shot someone and, since there were no other shootings in Hutchinson that week, that this someone was Heckel. The jury also did not consider each message in isolation. In addition to the one referring to shooting a "hoe," there were others reading, "I'm goin to prison anyhow," and "ah kill one of you clowns real talk bitch you fuck with Billy I'm steelin something from you every time you do it." The jury considered these messages in the context of Logsdon's conflicting statements during his interviews with the police, other inmates' testimony about his behavior and statements while in jail, and many witnesses' testimony about his involvement in the Rodriguez conspiracy. Again, we will not reweigh the evidence. Considering all the evidence in the case, we conclude a reasonable jury could infer some evidence of Logsdon's guilt from the messages.

Logsdon also addresses the firearms evidence in the case. This argument relates to most of the charges brought against Logsdon but, in particular, to his charge of being a felon in possession of a firearm. The parties stipulated Logsdon was a felon and prohibited from possessing a firearm at the time of the murder, and there is no dispute that two relevant firearms were found in the Nebraska home where Logsdon was arrested. We acknowledge these firearms were locked away in someone else's room and testimony established the key was not even in Logsdon's possession. Logsdon highlights these facts in an apparent attempt to call into question his "possession" of these firearms in Nebraska.

Logsdon fails to recognize, however, that the State did not charge him for possessing a firearm in Nebraska. Instead, the State charged him for possessing a firearm on the day of Heckel's death. Nevertheless, the firearms seized at the time of his arrest are a part of the relevant evidence of his possession on the day of the murder because one of the firearms recovered in Nebraska—the Colt .38—could not be excluded as the murder weapon. This meant, according to the State's expert witness, there was a fifty-fifty chance that the Colt .38 was used to shoot Heckel. Thus, some circumstantial evidence supported a finding that Logsdon wielded the .38, which police found in Nebraska, on the day of Heckel's murder.

Had this been the only evidence regarding firearms presented to the jury, we would have strong reservations about whether it was sufficient to support his criminal possession of a firearm conviction. But Logsdon told police investigators that Craig gave him a rifle and he tried to trade it for a pistol; a fellow inmate testified Logsdon said he traded a rifle for a revolver; and another inmate testified he and Logsdon had some discussion about one gun being traded for another. This last inmate also testified Logsdon was sure the gun used in the murder would not be found. Yet another witness testified Logsdon was looking to procure a gun prior to Heckel's death. Also, Logsdon's text message sent hours after the shooting referred to a shooting with "this new piece." Further, as we will discuss next in more detail, there is sufficient evidence from which a reasonable jury could conclude that Logsdon shot Heckel. Accordingly, a rational factfinder could have found Logsdon guilty of criminal possession of a firearm beyond a reasonable doubt.

This brings us to our overarching consideration of all the evidence against Logsdon and his final argument that all the evidence against him was circumstantial. Logsdon's argument initially rests on shaky ground because "[a] conviction of even the

gravest offense may be sustained by circumstantial evidence." *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 (1990); see *State v. Scott*, 271 Kan. 103, 107, 21 P.3d 516 (2001) (as long as there is substantial evidence, we will not disturb a guilty verdict "even though the evidence is *entirely* circumstantial" [emphasis added]). Circumstantial evidence, in order to be sufficient, "need not rise to that degree of certainty which will exclude any and every other reasonable conclusion." *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 551, 431 P.2d 518 (1967). Instead, circumstantial evidence "affords a basis for a reasonable inference by the jury" regarding a fact at issue. 199 Kan. at 550 (explaining circumstantial evidence "tends to prove a fact in issue by proving other events or circumstances which, according to the common experience of mankind, are usually or always attended by the fact in issue"). Further, Logsdon took full advantage of his opportunity to impress upon the jury the circumstantial nature of the evidence. See *Peoples*, 227 Kan. at 135 (noting defendant's opportunity to discuss weaknesses in State's case).

More specifically, as we look to the evidence in this case, the State presented sufficient evidence supporting Logsdon's convictions, despite its largely circumstantial and hearsay nature or the questions of witnesses' credibility. Many witnesses implicated Logsdon in the Rodriguez conspiracy. Several of the State's witnesses testified about what Logsdon himself said. See K.S.A. 2015 Supp. 60-460(g) (excepting party admissions from the general rule prohibiting hearsay). For example, Branton testified she and Logsdon conspired to rob Rodriguez and that it was Logsdon's idea to involve guns; she also testified Logsdon called her after he left the state, asked about Heckel's murder and what Craig was saying, and said he had "stayed up eight days too many and . . . shot her." Hill testified that he told police Logsdon asked him to participate in a robbery. Two inmates testified Logsdon showed them how Heckel was shot. Another inmate testified Logsdon said Heckel did not look nice in person and was a messy housekeeper. And yet

29

another inmate testified Logsdon was indignant about being charged with robbery because "when I shot that bitch her purse was sitting right there."

Furthermore, Logsdon sent the text messages and made some key statements to the police. Logsdon himself brought up a conspiracy to rob Rodriguez when he called Detective Harcrow from Nebraska and gave the names of several other people who might be involved—some of whom then testified against him at trial. In his postarrest interviews, he brought up several details of the crime unknown to the public, including the color of the car, the fact Craig owned a red Cadillac on the day of the murder, and the idea that the shooter went to the wrong house. He also informed a KBI agent that he had given 85 percent of the truth but would not divulge the remaining 15 percent because it would incriminate him. The jurors heard portions of these interviews and could judge for themselves Logsdon's demeanor.

In addition to witness testimony, the jury examined hundreds of exhibits— including audio and DVD tapes of police interviews with Logsdon. And the jury heard the forensic evidence about the gun found in the house where Logsdon was arrested.

As the State points out in summarizing the evidence, even after excluding the hearsay evidence mentioned in the limiting instruction: nine witnesses testified Logsdon provided unknown details of Heckel's murder, six witnesses testified they were told by someone other than Craig that Logsdon killed Heckel, two witnesses testified Logsdon confessed to the murder, Logsdon sent incriminating text messages shortly after Heckel's murder, Logsdon fled to Nebraska upon learning investigators might be looking for him, a gun that could not be eliminated as the murder weapon was found at the house where Logsdon was arrested, and the State introduced a video of Logsdon recreating the murder for other inmates.

We do not find, as the State argues, that the evidence against Logsdon was overwhelming. There are troubling aspects about the evidence and the trial. Nevertheless, we must view all the evidence in a light most favorable to the prosecution, and we conclude a rational factfinder could have found Logsdon guilty of all charges beyond a reasonable doubt. See *Frye*, 294 Kan. at 374-75; *Scott*, 271 Kan. at 107; *Casey*, 199 Kan. at 550-51.

ISSUE 2: *The district court did not abuse its discretion in denying Logsdon's two motions for a mistrial.*

Logsdon also argues the district court should have declared a mistrial due to the erroneous admission of witness testimony about Craig's out-of-court statements. Craig's refusal to testify is at the root of Logsdon's argument because it upset the district court's professed basis for admitting testimony about Craig's out-of-court statements. Logsdon makes two separate but related arguments about the denial of his motions for mistrial: (1) an evidentiary argument that the testimony was inadmissible hearsay and (2) a constitutional argument that the witness testimony violated his Sixth Amendment Confrontation Clause rights.

2.1. *Standard of Review*

A district court may order a mistrial if there is "[p]rejudicial conduct, in or outside the courtroom, [that] makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). In making this determination, the district court must engage in a two-step process: (1) it must determine if there is a "fundamental failure" in the proceeding; if so, (2) the district court must

31

determine "whether it is possible to continue the trial without an 'injustice.'" *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

In *Ward*, we explained that whether a fundamental error resulted in an injustice depends on whether the error affected substantial rights—meaning whether it affected the outcome of the proceedings. See 292 Kan. at 565. On appeal, we review the district court's ruling at each step for an abuse of discretion. In general, a district court abuses its discretion by issuing an order that is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. 292 Kan. at 551.

2.2. *Scope of Issue:  Preservation and Waiver*

Several preliminary considerations potentially limit the evidentiary issues requiring full analysis on appeal.

First, although Logsdon broadly claims the district court erred in admitting *any* testimony regarding statements made by Billy Craig to others, the State argues we cannot consider many of these instances. Two prudential considerations are implicated. Specifically, Logsdon failed to preserve some instances with a timely trial objection, and, in two different ways, he waived his argument as to others by failing to follow our appellate rules.

As to Logsdon's failure to make a timely trial objection, K.S.A. 60-404 provides that a verdict will not be set aside "by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." In other words, "evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the

alleged error at trial." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). This court has consistently refused to "review an evidentiary issue without a timely and specific objection even if the issue involves a fundamental right." *State v. Dukes*, 290 Kan. 485, 488-89, 231 P.3d 558 (2010) (requiring defendants to raise contemporaneous Confrontation Clause objections); see also *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) ("Without a contemporaneous objection, [defendant's] claim is being asserted for the first time on appeal and is subject to the general rule that alleged constitutional violations cannot be raised for the first time on appeal.").

Applying 60-404 means that not *all* testimony regarding Craig's statements are preserved for appeal. According to the State's count, it asked questions about Craig's statements "[a]t least a dozen times" over the 3-week trial, but "Logsdon made contemporaneous objections [only] seven times." We have not verified the State's count but do know Logsdon did not object to all of the testimony he discusses in his brief. For example, Logsdon complains on appeal about Hartman's testimony that Craig denied killing "that girl" and then started crying. But Logsdon elicited this testimony himself on cross-examination and obviously did not object. As a result, he cannot now claim it was admitted in error. See K.S.A. 60-404.

Second, Kansas Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41), requires an appellate brief to include "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." In *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014), we warned litigants that Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril. Then, in *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015), we held: "We are now sufficiently post-*Williams* that litigants have no excuse for noncompliance with Rule 6.02(a)(5)." Yet,

Logsdon's appellate brief contains a very limited number of pincites to specific trial objections. Consequently, he has failed to preserve any statement about which he complains that is not accompanied by a timely trial objection *and* a pincite in his brief.

Third, a failure to adequately brief an issue results in abandonment or waiver. See *State v. Rojas–Marceleno*, 295 Kan. 525, 543, 285 P.3d 361 (2012). In at least one instance, Logsdon cites a trial objection in his brief to a questions asked of Lieutenant Robertson but does not mention the witness by name or explain why his answer made any difference in the proceedings. Thus, we specifically hold Logsdon has waived any argument regarding Lieutenant Robertson's testimony about what Craig told Detective Harcrow.

As a result of the application of these various rules, we find Logsdon failed to preserve or has abandoned an evidentiary or constitutional objection to any witness testimony beyond the following six specific instances. Each of these instances were the subject of a timely trial objection and have been argued by Logsdon with a supporting citation to the record:

1. David Crother's testimony that the day after Heckel's murder Craig told him Logsdon shot Heckel;

2. Detective Rodriguez' testimony that Crothers told him about Craig's statement that Logsdon shot Heckel;

3. Detective Harcrow's testimony that, on June 30, Craig told him he had heard someone was shot in the head;

4. Leonard Hill's testimony that Craig told him about a plan to do a grab-and-go robbery of Kayla Rodriguez;

5. Kayla Rodriguez' testimony that Craig told her she knew he would not let anything happen to her; and

6. Kylie Hartman's testimony that she had heard Craig ranting and raving about Rodriguez owing him money.

According to the State, an additional consideration curtails the need for a full discussion of the merits of Logsdon's argument as to these statements. Specifically, the State argues Logsdon invited any error by not including all of these statements in a limiting instruction in which the district court told the jury to disregard some of Craig's statements.

2.3. *Scope of Issue: Limiting Instruction and Invited Error*

Some additional facts help explain the State's argument. As we mentioned above, Logsdon moved for a mistrial as soon as Craig refused to testify. The district court denied the motion and instead asked the parties to draft a limiting instruction to reduce the impact of the erroneously admitted testimony on the verdict. They did so. The State presented a proposed instruction, and Logsdon agreed with the State that they had "finally narrowed it down" to a specific list of witnesses—Crothers, Detective Rodriguez, and Detective Harcrow. Logsdon's attorney specifically agreed he had no other names to add to the list. Nevertheless, he objected to the proposed instruction "to be consistent."

Ultimately, the district court informed the jury that during trial the parties believed Craig would be a witness but, when called, he refused to testify. The instruction stated Craig was unavailable as a witness and the jury was instructed to

"disregard the testimony regarding the statements of Billy Craig that were specifically made during the testimony of the following witnesses:

1. David Crothers
2. Detective Bryan Rodriguez
3. Detective Dean Harcrow, regarding a meeting on June 30 with Billy Craig only

This instruction applies only to the witnesses named and not to the other statements you may have heard regarding Billy Craig in this trial."

Despite this instruction and his participation in its drafting, Logsdon filed a posttrial motion for mistrial in which he argued Craig's out-of-court statements were so prejudicial that the error could not be cured by the limiting instruction. The district court denied his motion.

The State argues Logsdon should not be allowed to claim error arising from any statement other than those mentioned in the limiting instruction because he helped draft the limiting instruction and failed to include the testimony. The State also points out that Logsdon's attorney explicitly told the court "that was the list that I had."

If that were the end of the issue before the district court, then we would agree with the State's argument. But that was not the end. Logsdon's attorney continued by objecting to the instruction, and the objection precludes application of the invited error doctrine. The invited error doctrine applies only when the party fails to object *and* invites the error,

36

unless the error is structural. See *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014) (holding that, if a party has not merely failed to object to a jury instruction but has instead invited error, we will not review the party's argument regarding that issue on appeal unless the error is structural); see also K.S.A. 2015 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous."); *State v. Williams*, 295 Kan. 506, 511, 286 P.3d 195 (2012); *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

We therefore conclude that the limiting instruction does not preclude Logsdon's ability to raise his present arguments as to the six witnesses and statements listed above. Yet, our consideration of the instruction does not end here because the State presents a second argument as to the three witnesses listed in the limiting instruction—Crothers, Detective Rodriguez, and Detective Harcrow. Specifically, the State argues the district court correctly determined the instruction cured any prejudice caused by the admission of Craig's out-of-court statements into evidence. Essentially, the State argues harmless error, which we will return to after a discussion of whether there was error.

2.4. *Hearsay Not Admissible Under K.S.A. 2015 Supp. 60-460(a)*

We turn first to Logsdon's arguments about hearsay. At trial, the State argued these six statements were not hearsay because Craig would be present and available for cross-examination. As we have previously noted, Kansas law allows the admission of an out-of-court statement if the person who made the statement—that is, the declarant— actually testifies during the trial. See K.S.A. 2015 Supp. 60-460(a). The district court,

37

relying on this exception to the hearsay rule, permitted witnesses to testify about what Craig told them out of court.

Clearly, 60-460(a) did *not* apply once Craig refused to testify. But it also did not apply even at the time the statements were introduced into evidence: Craig had not yet been given immunity, and our prior cases hold 60-460(a) cannot be used to admit an out-of-court statement if the declarant is still protected by his or her privilege against self-incrimination. See *State v. King*, 221 Kan. 69, 71-72, 557 P.2d 1262 (1976) (defense sought to admit recording of conversation between witness and defendant; we held defendant was not, at that point, "available" for cross-examination because she was still protected by her Fifth Amendment privilege; when defendant later took the stand, court did not abuse discretion in refusing to admit the self-serving tape because defendant's in-court testimony was best evidence); *State v. Oliphant*, 210 Kan. 451, 453, 502 P.2d 626 (1972) (witnesses who had claimed privilege against self-incrimination in previous proceedings were not available for cross-examination and 60-460[a] did not apply); see also *State v. Fisher*, 222 Kan. 76, 78, 563 P.2d 1012 (1977) (emphasizing that judges should use restraint in allowing admission of evidence under 60-460[a] and quoting S. Gard, Kansas Code of Civil Procedure 465 [1963] for proposition that the exception "could be subject to abuse" if judges allow reliance on its use when "better evidence is available and no good purpose is served by receiving" the out-of-court statement).

Here, Craig had been charged with crimes arising from the murder of Heckel, his Fifth Amendment privilege still applied, and he was not available for cross-examination when his various out-of-court statements were admitted. There is thus no question that 60-404(a) did not permit Hill, Rodriguez, Hartman, Crothers, Detective Harcrow, or Detective Rodriguez to testify about what Craig told them. Consequently, this testimony was inadmissible hearsay—*unless* another hearsay exception applied.

38

2.5. *The Coconspirator Hearsay Exception Applies*

The State argued to the district court, after Craig refused to testify, that Craig's statements were admissible under K.S.A. 2015 Supp. 60-460(i)(2) as statements of a coconspirator. The district court did not rule on this alternative basis for admission and instead gave the limiting instruction. On appeal, the State once again argues this alternative ground; it also argues it had a good faith reason for believing Craig would agree to testify. Briefly, as to this second argument, good faith does not make evidence admissible. But the State makes a valid argument regarding coconspirators' statements because K.S.A. 2015 Supp. 60-460(i)(2) permits

> "[a]s against a party, a statement which would be admissible if made by the declarant at the hearing if . . . the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination . . . ." K.S.A. 2015 Supp. 60-460(i)(2).

In order for this so-called "coconspirator exception" to apply:

> "(1) the person testifying must be a third party; (2) the out-of-court statement . . . must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been made while the conspiracy was in progress; and (4) the statement must be relevant to the plan or its subject matter." *State v. Betancourt*, 301 Kan. 282, 298, 342 P.3d 916 (2015).

As we noted above, the district court never ruled on this exception but instead decided to instruct the jury to disregard at least some evidence. Under some circumstances, this might preclude our consideration of this alternative exception. But here, Logsdon's statements that the limiting instruction covered all the witnesses on his

list would have reasonably led the district court and the State to believe no further rulings were necessary. And while Logsdon objected to the instruction, he did not state a specific objection that would alert the district judge or the State to the necessity for additional findings. Nor does he argue the State should be prohibited from making the argument on appeal. Under these unique circumstances, we will consider the State's argument that the coconspirator exception would apply; we also note Logsdon does not attempt to refute this argument.

Furthermore, the record allows us to apply the exception because Craig was charged as a coconspirator, and ample evidence supports his involvement, including the testimony of Logsdon and other coconspirators. Also, the content of Craig's statements to Kayla Rodriguez, Hartman, and Hill reflect that the statements were about the conspiracy while it was ongoing. See *Betancourt*, 301 Kan. at 298. The district court thus did not err in admitting this testimony—although it was hearsay, it qualified for an exception and was admissible. See *State v. May*, 293 Kan. 858, 870, 269 P.3d 1260 (2012) (appellate court can affirm even if reasoning differs from district court).

Moreover, to the extent Logsdon argues any testimony of these three witnesses regarding Craig's statements was so prejudicial that the district court erred in allowing them into evidence, we disagree. First, Logsdon fails to cite a legal basis for arguing that prejudice precludes the admission of a coconspirator's statements. Second, we find no basis to conclude the district court abused its discretion in this regard because the statements were not unduly prejudicial. See *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013) (Even if evidence is relevant, a trial court has discretion to exclude it where the court finds its probative value is outweighed by its potential for producing undue prejudice. See K.S.A. 60-445. An appellate court reviews any such determination for an abuse of discretion.). A review of the evidence explains our conclusion.

With regard to Craig's statements to Kayla Rodriguez, Logsdon asserts this testimony tied him to the plan to rob Rodriguez and supported the State's theory of mistaken identity. But Rodriguez' testimony about Craig's statement did not implicate Logsdon. Plus, there was plenty of other, unobjected-to evidence tying Logsdon to the conspiracy involving Rodriguez, and there was also quite a bit of other evidence suggesting nobody ever intended to kill Heckel, including Logsdon's own statements to police.

As for Hartman's alleged hearsay testimony, the State correctly points out that Logsdon only objected when she said that Craig ranted and raved about Rodriguez' debt. Any error in admitting that statement was harmless in light of Logsdon's own statements to police about a debt "the girl" owed Craig and multiple, conflicting statements about who owed whom and how much—all of which was presented at trial.

Then, regarding Hill's testimony that Craig said the murder was not Logsdon's plan and the robbery was supposed to be a nonviolent grab-and-go, the same sort of testimony was admitted through other witnesses who were involved in the planning of the robbery—such as Branton's testimony that the original plan was nonviolent and involved counterfeit money.

Accordingly, we hold the district court did not err in overruling Logsdon's hearsay objections relating to these three witnesses.

This leaves Crothers' testimony that Craig told him Logsdon was the shooter, Detective Rodriguez' testimony that Crothers' repeated what Logsdon had told him, and Detective Harcrow's testimony that Craig had told him of the rumor that the victim had

been shot in the head. The State concedes Detective Rodriguez' testimony was inadmissible, and this concession carries over to Crothers' testimony, which Detective Rodriguez was essentially repeating. In light of this concession, we will, without analysis, assume error. However, as to the final claim of hearsay error, the State argues Detective Harcrow's testimony was not hearsay because the statement was not admitted for the truth of the matter asserted—that is, it was not admitted to prove Heckel had been shot in the head. Rather, the argument goes, it was admitted to explain why detectives began to investigate Craig and his associates.

Had the detective simply said that Craig provided information that had not yet been made public, the State's point would have persuaded us. But the State wanted the jury to understand the truth of the statement—that Heckel had indeed been shot in the head and Craig knew it. The detail of Craig's statement and its truth made it more believable that Craig (and, in turn, his associates) were tied to the crime. Although the State proved the nature of Heckel's injuries in other ways, it still presented this testimony for the truth of the matter it asserted. The State does not argue this testimony falls under any hearsay exception.

This means we either assume or find that the district court erred in overruling Logsdon's hearsay objection to Detective Harcrow's, Detective Rodriguez', and Crothers' statements about comments made by Craig. Before discussing whether these errors resulted in an injustice, we will discuss Logsdon's claim that these errors were also a violation of his constitutional right to confront witnesses.

2.6. *Confrontation Clause*

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." See *Pointer v. Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (applying the Confrontation Clause to state prosecutions). This right is violated if an unavailable declarant's testimonial statements are brought into evidence against a person without a prior opportunity to cross-examine that declarant; whether the statements are "testimonial" is the threshold question. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *State v. Bennington*, 293 Kan. 503, 508, 264 P.3d 440 (2011). Neither party claims Craig was previously available for cross-examination. Thus, if Craig made testimonial out-of-court statements to a witness who then testified about those statements, a fundamental error occurred.

We have established four factors to be considered in determining when evidence is testimonial:

"(1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime? (2) Was the statement made to a law enforcement officer or to another government official? (3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether (a) the declarant was speaking about events as they were actually happening, instead of describing past events; (b) the statement was made while the declarant was in immediate danger, *i.e.*, during an ongoing emergency; (c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and (d) the interview was part of a government investigation?; and (4) was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.*, was the statement made in response to questions, was the statement recorded, was the declarant removed from

43

third parties, or was the interview conducted in a formal setting such as in a governmental building?" *State v. Brown*, 285 Kan. 261, Syl. ¶ 15, 173 P.3d 612 (2007).

See also *Crawford*, 541 U.S. at 68 (leaving "for another day any effort to spell out a comprehensive definition of 'testimonial,'" though stating the term at least covers, *inter alia*, statements made during police interrogations").

None of those four factors apply to Craig's statements to his own friends or acquaintances, including four of the six statements subject to our review—that is, those of Kayla Rodriguez, Hartman, Hill, and Crothers. See *Brown*, 285 Kan. 261, Syl. ¶ 15. An objective witness would not have reasonably believed the statements would later be available for use in the prosecution of a crime; the statements were not made to a government official; the primary purposes of the conversations were not for proof to be used in prosecuting a crime; and the statements occurred in informal conversations between friends and acquaintances. See, *e.g.*, *Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); *Crawford*, 541 U.S. at 51 (explaining that an "off-hand, overheard remark" might be excluded under hearsay rules but "bears little resemblance to the . . . abuses the Confrontation Clause targeted); *Bennington*, 293 Kan. at 510, 513 (stating, in the context of domestic violence, that a declarant's statements to friends and neighbors would be excluded at trial, if at all, by hearsay rules alone, not because they were testimonial); *Brown*, 285 Kan. at 288 (recognizing "indications that the court intended to exclude private or casual conversations from the definition of testimonial statements").

Furthermore, the United States Supreme Court has stated that among those statements "that by their nature [are] not testimonial [are] for example, business records or statements *in furtherance of a conspiracy*." (Emphasis added.) *Crawford*, 541 U.S. at

44

56; see also *Dutton v. Evans*, 400 U.S. 74, 83, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970) ("We cannot say that the [coconspirator] evidentiary rule applied by Georgia violates the [Sixth Amendment to the United States] Constitution merely because it does not exactly coincide with the hearsay exception applicable in the decidedly different context of a federal prosecution for the substantive offense of conspiracy."); *Betancourt*, 301 Kan. at 300. In this case, Craig's statements to Hill and Hartman clearly furthered the alleged conspiracy to rob Kayla Rodriguez and, arguably, so did his statement to Rodriguez.

Thus, although Kayla Rodriguez, Hartman, Hill, and Crothers (and Detective Rodriguez by repeating Crothers' statements) offered hearsay evidence at trial, their testimony did not implicate the Confrontation Clause given that all statements arose in the context of informal conversations among friends and acquaintances.

This leaves a possible Confrontation Clause violation in the testimony of Detective Harcrow (about Craig's statement he heard someone had been shot in the head).

The State fails to address why this statement by Craig was not testimonial and why the detective's testimony about these statements did not violate the Confrontation Clause—in fact, the State makes no mention of the Confrontation Clause during its discussion of this testimony. At most, the State relies on its argument the statement was not hearsay and that it acted in good faith. Yet, the Sixth Amendment prohibits testimonial statements without prior opportunity for cross-examination, *even if* those statements would be admissible under hearsay rules, and there is no good faith exception to Confrontation Clause requirements. See *Crawford*, 541 U.S. at 55 (holding a prior opportunity to cross-examine was a *necessary*, not merely sufficient, condition for admitting testimonial statements at the time the Confrontation Clause was created); *Crawford*, 541 U.S. at 61 (ruling the Sixth Amendment's protections should not be left to

45

"the vagaries of the rules of evidence"). Because Logsdon makes at least a colorable argument that statements to a detective are testimonial and, considering the State's silence on the matter, we assume, again without analysis, there was a Confrontation Clause error in the admission of Detective Harcrow's testimony about Craig's statement. See *Brown*, 285 Kan. 261 Syl. ¶ 15.

2.7. *Impact on Logsdon's substantial rights*

Assuming that error occurred in denying Logsdon's hearsay objection to the testimony of Crothers, Detective Rodriguez, and Detective Harcrow regarding Craig's statements and that Detective Harcrow's statement also violated Logsdon's right to confront a witness, we must next consider whether the district court erred in concluding the trial could proceed without an injustice. In making this assessment, a district court must determine whether the error "affect[ed] the outcome of the trial in light of the entire record." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011).

In *Ward*, we explained that in considering a motion for mistrial:

"[t]he degree of certainty by which the court must be persuaded that the error did not affect the outcome will vary depending on whether the fundamental failure infringes upon a right guaranteed by the United States Constitution. If it does not, the trial court should apply K.S.A. 60-261 and determine if there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record. If the fundamental failure does infringe upon a right guaranteed by the United States Constitution, the trial court should apply the constitutional harmless error analysis defined in *Chapman v. California* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), in which case the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire

46

record, *i.e.,* proves there is no reasonable possibility that the error affected the verdict. . . . *An appellate court reviewing the second step for an injustice will review the entire record and use the same analysis, applying K.S.A. 60-261 and K.S.A. 60-2105 or else* Chapman*, depending on the nature of the right allegedly affected.* (Emphasis added.) *Ward*, 292 Kan. at 569-70.

We also instructed the district courts to consider "whether any damage caused by the error can be or was removed or mitigated by admonition, instruction, or other curative action." 292 Kan. at 569-70. Generally, we presume juries follow the court's instructions. See *State v. Williams*, 299 Kan. 509, 560, 324 P.3d 1078 (2014).

Here, the district judge instructed the jury to disregard the testimony of Crothers and Detective Rodriguez relating to any of Craig's statements and to disregard the testimony of Detective Harcrow regarding Craig's June 30 statement. On appeal, Logsdon fails to present any reason to suspect this particular jury improperly considered the listed statements despite being instructed not to do so. And our own review of the record leaves us with no reason to suspect the jury disregarded the instruction. The instruction removed any damage caused by admitting the error. Moreover, Crothers' statements (repeated by Detective Rodriguez) were essentially cumulative of other evidence about the crime and Logsdon's involvement. And while Craig's statement to Detective Harcrow was particularly incriminating as to Craig, it did not in any way incriminate Logsdon.

In light of these considerations we are persuaded the State has met its burden under both K.S.A. 60-261 and the constitutional harmless error standard. See *Ward*, 292 Kan. at 565; see also *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 (2013) ("[W]here both the constitutional and nonconstitutional error clearly arise from the very same acts and omissions, we will logically begin with our harmlessness analysis of the constitutional error. This is because if we conclude the constitutional error is not harmless

47

and reverse the convictions, there is no point in analyzing whether the State met the lower standard for harmlessness under K.S.A. 60-261.").

Accordingly, we hold the district court did not abuse its discretion in denying Logsdon's motions for mistrial to the extent the motions were based on a violation of the Sixth Amendment.

ISSUE 3: *The district court did not err in instructing the jury on aiding and abetting liability.*

Logsdon next argues the district court's use of an aiding and abetting instruction misled the jury about what was needed to return a guilty verdict for first-degree murder. According to Logsdon, the State's theory of the case was that Craig drove Logsdon to Heckel's house and then Logsdon shot her—in other words, the State never pursued an aiding and abetting theory and so an aiding and abetting instruction should not have been issued. Further, Logsdon contends, the aiding and abetting instruction impermissibly allowed the jury to find Logsdon guilty of premeditated and felony murder based solely on discussions Logsdon may have had with Craig about a mere *plan* to rob Kayla Rodriguez.

Here, *both* parties requested the jury be instructed on aiding and abetting liability. Logsdon specifically requested a jury instruction stating that a person who intentionally aids another in committing a crime is criminally responsible for that crime regardless of the extent of his participation. The State requested a similar instruction, and the district court provided the pattern instruction on aiding and abetting.

48

When examining jury instruction issues, we follow a three-step process:

"'(1) determining whether the appellate court can or should review the issue, *i.e.* whether
there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
(2) considering the merits of the claim to determine whether error occurred below; and
(3) assessing whether the error requires reversal, *i.e.,* whether the error can be deemed
harmless.'" *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015) (quoting *State v.
Williams*, 295 Kan. 506, 510, 286 P.3d 195 [2012]).

The "first and third step are interrelated in that whether a party has preserved a
jury instruction issue will affect [the court's] reversibility inquiry at the third step."
*Bolze-Sann*, 302 Kan. at 209; see also K.S.A. 2015 Supp. 22-3414(3) ("No party may
assign as error the giving or failure to given an instruction . . . unless the party objects
thereto before the jury retires to consider its verdict stating distinctly the matter to which
the party objects and the grounds of the objection unless the instruction or the failure to
given an instruction is clearly erroneous.").

Our analysis ends at the first step—if a party has not merely failed to object to a
jury instruction but has instead invited error, we will not review the party's argument
regarding that issue on appeal unless the error is structural. See *State v. Verser*, 299 Kan.
776, 784, 326 P.3d 1046 (2014); *State v. Hargrove*, 48 Kan. App. 2d 522, 531, 293 P.3d
787 (2013).

We decline to review Logsdon's argument regarding the aiding and abetting jury
instruction because he specifically requested the instruction—thereby inviting any error
that occurred. *State v. Devine*, 291 Kan. 738, 742, 246 P.3d 692 (2001) (explaining a
party may not invite error and then complain of the error on appeal). Logsdon does not

raise any constitutional argument regarding this instruction, nor does he explain why his explicit request for the aiding and abetting instruction does not preclude our review. See *Hargrove*, 48 Kan. App. 2d at 531-33.

ISSUE 4: *Logsdon's hard 50 sentence was imposed in violation of the Constitution.*

Although we affirm Logsdon's convictions, we must, as he urges, vacate his hard 50 life sentence. Logsdon was sentenced pursuant to K.S.A. 2012 Supp. 21-6620, which imposed a mandatory 50-year sentence, without the possibility of parole, for a defendant convicted of premeditated first-degree murder if the district court concluded that certain statutory aggravating circumstances were present and were not outweighed by any mitigating circumstances. We have previously held this hard 50 sentencing scheme was unconstitutional under the Sixth Amendment because the factual findings necessary to impose the enhanced minimum sentence were made by a judge by a preponderance of the evidence rather than by a jury beyond a reasonable doubt. See *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2160-63, 186 L. Ed. 2d 314 (2013); *State v. Warren*, 302 Kan. 601, 621-24, 356 P.3d 396 (2015); *State v. Soto*, 299 Kan. 102, 103-04, 322 P.3d 334 (2014).

The State concedes Logsdon's hard 50 life sentence must be vacated and he should be resentenced, which leaves us only to decide how resentencing should be accomplished. We decline the State's suggestion (which was unaccompanied by any citation to legal authority) to order the preparation of a nunc pro tunc or amended journal entry of sentencing because, in our view, Logsdon's sentence accurately reflects the judgment rendered at the time. See *State v. Mebane*, 278 Kan. 131, 136, 91 P.3d 1175 (2004) (explaining nunc pro tunc orders are appropriate to correct clerical errors arising from oversight or omission); *State v. Lyon*, 207 Kan. 378, 380, 485 P.2d 332 (1971). We

50

acknowledge the State's assertion that it does not wish to pursue a hard 50 life sentence on remand, but we are not inclined to choose which sentence would be appropriate in its place. Instead, we simply remand for resentencing so as to permit the parties to present their sentencing arguments to the district court.

Accordingly, for the foregoing reasons, we affirm Logsdon's convictions but vacate the sentence and remand for resentencing.