NOT DESIGNATED FOR PUBLICATION

No. 114,436

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PAUL DAVIS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Jackson District Court; MICHEAL A. IRELAND, judge. Opinion filed September 23, 2016. Affirmed.

*Paul Davis*, appellant pro se.

*Natalie Chalmers*, assistant solicitor general, for appellee.

Before ARNOLD-BURGER, P.J., MCANANY and GARDNER, JJ.

*Per Curiam*:  Over a decade ago, T.G. reported that her stepfather, Paul Davis, raped her. A jury convicted him of several sex crimes, and the district court sentenced him to 254 months' imprisonment. After an unsuccessful direct appeal and a failed motion for new trial, Davis filed a K.S.A. 60-1507 motion that asserted various errors, including the ineffectiveness of his trial and appellate attorneys. After an extensive evidentiary hearing, the district court denied his motion, and Davis now appeals. Finding no error, we affirm.

FACTUAL AND PROCEDURAL HISTORY

While additional facts will be provided as necessary, a brief overview of this case's history follows:

In November 2003, 11-year-old T.G. reported that Davis raped and digitally penetrated her. Accordingly, the State charged him with two counts of rape and two counts of aggravated indecent liberties with a child. However, Davis left his family that same month, drifting from city to city until he was picked up by law enforcement years later.

At a jury trial in September 2009, T.G. testified about the extent and nature of the assaults. Her mother, a sexual assault nurse examiner, and the law enforcement officer who interviewed her each recounted T.G.'s account of the assaults, as well. The jury also watched a videotaped interview between T.G. and law enforcement. For his part, Davis testified about his tumultuous relationship with T.G.'s mother and his decision to leave the family. He denied any sexual contact with T.G. In the end, the jury convicted Davis of all four charges, and the district court sentenced him to 254 months' imprisonment. Davis timely appealed, and this court affirmed his convictions and sentence. *State v. Davis*, No. 103,543, 2011 WL 3795243 (Kan. App. 2011) (unpublished opinion), *rev. denied* 293 Kan. 1109 (2012) (*Davis I*).

Later, in December 2012, Davis filed a motion for new trial based on newly discovered evidence. He based on the motion in part on an affidavit from one of T.G.'s relatives, S.U., arguing that the affidavit called the veracity of T.G.'s trial testimony into question. The district court denied the motion, and this court affirmed the decision. *State v. Davis*, No. 109,386, 2013 WL 4566450, at *3 (Kan. App. 2013) (unpublished opinion) (*Davis II*).

While *Davis II* was pending, Davis filed a K.S.A. 60-1507 motion with the district court. There, he raised four primary claims:  (1) that the State lost or destroyed important evidence; (2) that his trial counsel failed to provide adequate representation; (3) that his appellate counsel failed to provide adequate representation; and (4) newly discovered evidence. He also claimed that cumulative error deprived him of a fair trial. He supported his arguments with a large number of attachments. The district court summarily denied his motion, and he appealed. However, on appeal, this court determined that the district court erred by denying the motion and reversed for an evidentiary hearing. *Davis v. State*, No. 110,387, 2014 WL 1302636, at *9 (Kan. App. 2014) (unpublished opinion), *rev. denied* 301 Kan. 1045 (2015) (*Davis III*).

On remand, the district court held a 2-day evidentiary hearing on Davis' motion. But after reviewing all the evidence and arguments, the district court denied the motion. Davis again appealed. We will take each issue in turn.

THE OPPORTUNITY TO MAKE A PROFFER OF EXPERT WITNESS TESTIMONY

On appeal, Davis argues that the district court violated his due process rights when it limited his ability to proffer the testimony of certain witnesses during the evidentiary hearing on this K.S.A. 60-1507 motion. That said, a little context is required to better understand his position.

*Davis presents two experts, Gregory Gilbertson and Evangeline Barefoot, and the State objects.*

At the hearing, the State objected to one Davis' witnesses, a professor named Gregory Gilbertson. In response to this objection, the district judge requested that Davis proffer what testimony he expected from Gilbertson. When Davis started to provide conclusions rather than facts, the district judge stopped him and walked him through the

3

issues to better understand why Davis called Gilbertson. At that time, Davis revealed that he expected Gilbertson to testify about trial counsel's effectiveness and the potential withholding of exculpatory evidence by the State. When the State again objected—this time to Gilbertson's credentials—the district judge again walked Davis through Gilbertson's qualifications to pass on trial counsel's effectiveness. After Davis' standby counsel and the district judge each questioned Gilbertson on a few specific issues, the district judge decided against allowing Gilbertson to testify as an expert.

In light of this ruling, Davis asked to read a "question-answer" proffer into the record; however, the district judge stopped him several times, explaining that he was not providing a proper proffer. In fact, the district judge explained that Davis needed to "tell [him] what [Gilbertson] would say that you want on the record" by saying "[Gilbertson] would say this, this, this, and this." But despite this example, Davis continued to struggle with supplying a proffer. Eventually, the district judge agreed to consider part of Gilbertson's report as Davis' proffer.

Later, Davis called Evangeline Barefoot, ostensibly to rebut one of the State's trial witnesses and to demonstrate the need for a defense medical expert. Before Barefoot testified, the district judge asked Davis for a proffer "as to exactly what we are getting into" with the witness. Again, Davis struggled to explain the exact nature of Barefoot's testimony, leaving the district judge to essentially walk him through the proffer. Similarly, as Davis started questioning her, the district judge stopped him a few times, apparently trying to keep the examination on point. The district judge explained, "[A]ll anybody in this court needs from this young lady is what did she examine and what his her opinion." The district judge continued to interrupt Davis throughout Barefoot's testimony, as Davis continued "going off onto other things" unrelated to the goal of rebutting the trial testimony at issue.

4

At one point, Davis asked Barefoot whether the medical reports she reviewed reflected that T.G. had taken the drug Adderall. When Davis questioned her on the possible side effects of Adderall, however, the district judge stopped him, saying, "You are now past the purpose of why you called [Barefoot] and what you told me you were going to use her for." When Davis asked to proffer "a question and answer of the questions and expected testimony from Miss Barefoot that the Court did not allow me to ask," the district judge denied his request.

*We examine due process violations in general and our standard of review.*

The question of whether a party's due process rights have been violated is a question of law over which this court exercises unlimited review. *In re Care & Treatment of Sykes*, 303 Kan. 820, 823, 367 P.3d 1244 (2016). Generally speaking, due process encompasses two major elements: notice and a meaningful opportunity to be heard. See *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1275, 136 P.3d 457 (2006). In his brief, Davis essentially argues that the district court stripped him of the latter by refusing to let him complete his proffers unhindered.

Preliminarily, K.S.A. 2015 Supp. 60-243(c) provides that when an objection to certain testimony is sustained, "the examining attorney may make a specific offer of what the examining attorney expects to prove by the witness' answer." In a nonjury proceeding, "the court on request must take and report the evidence in full unless it clearly appears that the evidence is not admissible." K.S.A. 2015 Supp. 60-243(c). For that reason, "[w]here the trial court rules that expert testimony is inadmissible, it is error to refuse a proffer of that testimony into the record." *State v. Hodges*, 241 Kan. 183, Syl. ¶ 3, 734 P.2d 1161 (1987).

*Application of the law to the facts, indicates no due process violation.*

As previously outlined, the district court here limited the testimony of two experts. But despite Davis' argument to the contrary, it is very clear that the district court allowed a proffer as to Gilbertson's testimony. The district court entertained several false starts by Davis before finally allowing Gilbertson's report to stand in as his proffer. Davis offers no explanation as to how this report differs from or is deficient to the oral proffer he wished to provide. Moreover, given that he agreed to submit the report as his proffer, Davis invited any error that stems from this decision. See *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1203-04, 308 P.3d 1238 (2013).

As for Barefoot's excluded testimony, the record clearly reflects that the district court tried several times to guide Davis through his questioning to keep the examination on point. Moreover, when the district court stopped Davis from asking about Adderall's side effects, Davis asked to read into the record "a question and answer of the questions and expected testimony." As a general rule, a proffer of excluded evidence must simply "make known the substance of the expected evidence." *Carrick v. McFadden*, 216 Kan. 683, Syl. ¶ 3, 533 P.2d 1249 (1975). For that reason, "[a] formal offer of proof in question and answer form is not required provided an adequate record is made in some other manner which discloses the evidence sought to be introduced." 216 Kan. 683, Syl. ¶ 3.

By the time the district court stopped Davis from pursuing the line of questions concerning Adderall, he had already asked Barefoot about the drug's possible side effects. In fact, the district court asked Barefoot its own pointed questions about Adderall before shutting down that particular line of inquiry. Therefore, while the district court in fact denied Davis' proffer, the record clearly discloses that he wished to introduce the side effects of Adderall and their potential effects on T.G. into evidence.

6

More importantly, Davis raises no argument that the district court improperly excluded Barefoot's testimony about the Adderall. Instead, he argues only that the district court needed to allow him to proffer. This differs significantly from the situation discussed in *Hodges*, where the appellant "on the one hand was required by statute to proffer the evidence into the record . . . but, on the other hand, was prevented from doing so by the trial court's ruling." 241 Kan. at 192. In other words, the "'Catch-22'" that concerned our Supreme Court in *Hodges* is simply not present in this case. See 241 Kan. at 192.

Given that the district court did allow a proffer of Gilbertson' testimony and the record clearly reflects the substance of Barefoot's excluded testimony, it cannot fairly be said that the district court stripped Davis of his due process rights. Accordingly, Davis' attempt to undermine the district court's decision on this ground is denied.

WITHHOLDING EXCULPATORY EVIDENCE

Davis next argues that the State either withheld or destroyed photographs taken by sexual assault nurse examiner Joy Thomas and destroyed a letter Davis posted on the victim's door before he left town. As to the photographs, Thomas testified at trial and at the K.S.A. 60-1507 hearing that although she photographed T.G.'s genitalia during her sexual assault examination, the photographs developed from that film were never returned to her. Police Chief David Lanning admitted that when the film was developed, the photographs did not turn out. Davis contends that any error in developing the film was actually intentional and violated the State's duty to disclose material exculpatory evidence. See *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

But because violations such as these (called *Brady* violations) constitute trial errors, this court in *Davis III* essentially determined that Davis could only successfully

7

challenge this issue if he showed exceptional circumstances. See 2014 WL 1302636, at *7-8. But this court also found that "in order to determine if exceptional circumstances existed . . . it must be determined whether Davis' appellate counsel was ineffective for failing to raise these issues on direct appeal." 2014 WL 1302636, at *7. Additionally, Davis raises elements of this potential *Brady* violation in two of his other issues on appeal. As such, a full examination of whether the State withheld or destroyed the photographs is necessary to the outcome of the instant case.

As our Supreme Court explained a few years ago, "[a] prosecutor's withholding of exculpatory evidence is misconduct that implicates constitutional rights, regardless of the prosecutor's good or bad faith." *Wilkins v. State*, 286 Kan. 971, 989, 190 P.3d 957 (2008). As such, a defendant who raises a *Brady* challenge must demonstrate that the evidence at issue was (1) favorable to him or her, (2) suppressed by the State, and (3) the cause of some prejudice. 286 Kan. at 989. That said, in cases like this one where the defendant argues that the State simply failed to preserve evidence, the defendant must demonstrate bad faith in order for his or her due process rights to be violated. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

Davis faces two hurdles in attempting to prove his *Brady* violation. First, the record provides no evidence of bad faith by the State. Testimony at trial clearly explained that after being processed at Fox Photography, the pictures were all black. And while Davis repeatedly attempts to imply that this processing error was no accident, one of his witnesses at the evidentiary hearing even testified that, in her experience, sexual assault examination photographs sometimes failed to process properly. Second, the photographs in this case are not exculpatory. By definition, exculpatory evidence is that which tends to disprove a fact that is material to guilt. *State v. Lackey*, 295 Kan. 816, 823, 286 P.3d 859 (2012). As will be explained in the next section, T.G.'s physical exam revealed no signs of trauma or injury. Given that the jury heard Thomas testify to the lack of any visible

injury—the same evidence that would have been present in the photographs—Davis cannot demonstrate any prejudice stemming from their absence.

Because Davis failed to show that the photographs were destroyed through bad faith, that they were favorable to him, or that he suffered any prejudice, no *Brady* violation occurred in this case. Accordingly (and as will be discussed later), his attorneys were not ineffective for failing to raise these issues either below or on appeal.

As to Davis' claim that a letter he posted on the victim's door prior to leaving town explaining his departure constitutes a *Brady* violation, this court has previously determined that that particular claim is barred by res judicata, so we need not address it again here. See *Davis III*, 2014 WL 1302636, at *6.

EFFECTIVENESS OF TRIAL COUNSEL

With those preliminary issues out of the way, this court must next decide whether the district court properly denied Davis his requested relief. When faced with a K.S.A. 60-1507 motion, the district court can either summarily dismiss the motion, hold a preliminary hearing and deny the motion if there are no substantial issues in play, or, as here, hold a full evidentiary hearing on the issues. *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014). On review from a full hearing, this court reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. This court exercises unlimited review over those legal conclusions. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013).

Davis bases his K.S.A. 60-1507 motion largely on his trial counsel's alleged ineffectiveness. Claims like this one present mixed questions of law and fact. To prevail on a claim for ineffective assistance of counsel, the criminal defendant must establish

both that the performance of counsel was deficient under the totality of the circumstances and that he or she suffered prejudice. *Sola-Morales*, 300 Kan. at 882 (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). All that said, judicial scrutiny of counsel's performance is highly deferential, and a reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). If counsel makes a strategic decision after completing a thorough investigation of the law and facts relevant to the case, that decision is virtually unchallengeable. Decisions made after a less than comprehensive investigation are reasonable to the extent that reasonable professional judgment supports the limitations of the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013).

To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Miller v. State*, 298 Kan. 921, 934, 318 P.3d 155 (2014). In this context, a reasonable probability is one sufficient to undermine confidence in the outcome. 298 Kan. at 934. And when reviewing the district court's decision on counsel's effectiveness, an appellate court reviews the underlying factual findings for support by substantial competent evidence and the legal conclusions based on those facts de novo. *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014).

*The lack of pinpoint citations are not fatal to our review.*

As a preliminary matter, the State argues that we should consider Davis' argument waived and abandoned. Davis failed to comply with Kansas Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. Rule Annot. 41) which provides:  "Each issue must begin with . . . a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." The State also directs this court to *State v. Logsdon*,

10

304 Kan. 3, 29, 371 P.3d 836 (2016), where our Supreme Court determined that the defendant "failed to preserve any statement about which he complains that is not accompanied by a timely trial objection *and* a pincite in his brief." Because Davis failed to provide a pinpoint citation to where the "issue was raised or ruled on below," the State contends that *Logsdon* controls.

But *Logsdon* grappled with the defendant's challenge to certain evidence that he believed was inadmissible at trial. In order to preserve these sorts of evidentiary issues for appeal, the defendant must first lodge a contemporaneous objection. See K.S.A. 60-404; *Logsdon*, 304 Kan. at 28. Instead, the defendant in *Logsdon* both failed to object every time this evidence was referenced and included "a very limited number of pincites to specific trial objections" in his brief." 304 Kan. at 29. As such, our Supreme Court determined that he failed to preserve many of his challenges for appeal. 304 Kan. at 29.

Here, Davis clearly provided many citations to the record throughout his brief, especially as he reviewed the facts underlying his appellate claims. Although his brief is perhaps not as well organized as one prepared by an attorney, a review of these citations clearly demonstrates that Davis raised each of his appellate issues at his evidentiary hearing. Given that Davis filed his brief without the assistance of an attorney and the appellate issues he raises lack the technical contemporaneous objection requirement of those in *Logsdon*, we find he has complied sufficiently with Supreme Court Rule 6.02(a)(5). Accordingly, we will consider the merits of his motion.

In his brief, Davis raises six separate allegations of ineffective assistance of counsel. Each one will be discussed separately, with special attention paid to the relevant facts.

11

*Failure to obtain a medical expert to rebut the State's witness was not unreasonable.*

First, Davis challenges his counsel's failure to obtain a medical expert to rebut the State's expert witness. According to Davis, an expert would have called into question T.G.'s timeline and extent of any potential sexual assault. Further, Davis contends that his counsel could have easily located such a witness.

To better contextualize this argument, a brief review of the facts as presented at trial are required. At trial, Thomas testified about the nature and extent of T.G.'s injuries. Highly summarized, Thomas provided that because of T.G.'s age and the length of time since the last assault, she limited her examination to externally observing T.G.'s genitalia using a magnifying camera. Thomas did not observe anything abnormal, such as injuries or scarring. However, Thomas also testified that a lack of injury is not abnormal with children and that an exam is not guaranteed to reveal whether someone has had sexual contact.

At the evidentiary hearing, Davis' trial counsel testified that he did not believe that anything required him to hire a medical expert to weigh in on T.G.'s allegations or examination. That said, counsel acknowledged that Davis' wife urged him to obtain a medical expert. Counsel explained that in order to rebut Thomas' findings, he would have needed "to find a medically qualified witness who would say . . . something to the effect that that's crazy, of course you're going to find physical evidence given the allegations of sexual abuse." But despite looking, counsel never located an appropriate expert. However, counsel also testified that he had experience in other child sexual abuse cases. In fact, he testified that he and another lawyer at his firm were both looking for "similar stuff and testimony." He also provided that he spoke to a doctor in Wichita "who had done some testimony before and was refusing to now." Counsel admitted that an expert of that nature would have helped the defense. In sum, counsel said that finding a medical expert was difficult, leading him to rely on good cross-examination techniques.

12

In her testimony, Barefoot essentially explained that a child's risk for injury from sexual assault depends on her age and developmental stage. According to her, an important question in evaluating this risk is whether the child has begun menstruating—a question she did not find in Thomas' report. Barefoot opined that based on T.G.'s age and the nature of her allegations, she would have expected to see some sign of injury or trauma on a physical examination. She also testified that, in her experience, victims that were examined about 48 hours after the assault showed some sign of physical injury. But Barefoot acknowledged that the body heals itself more as time progresses and that 6 days—the length of time between the assault and examination in this case—"push[ed] th[e] limit" of evidence collection.

Considering all this, the district court determined that Davis failed to prove that his counsel acted ineffectively. Instead, the district court found that counsel's strategy and preparations met "the standard of reasonableness for a criminal defense attorney."

As previously mentioned, a reviewing court must presume that counsel acted reasonably, and strategic decisions are nearly unchallengeable. See *Kelly*, 298 Kan. at 970; *Cheatham*, 296 Kan. at 437. Here, counsel's decision to not hire a medical expert appears both a strategic and practical one. Counsel searched for an appropriate expert, but discovered that locating one was difficult and ultimately decided to rely on cross-examination to undermine the evidence. Moreover, as counsel observed at the K.S.A. 60-1507 hearing, Thomas' testimony limited the defense to looking for an expert who would refute the largely positive finding that T.G. suffered no physical injury. And according to counsel, the one doctor in Wichita who formerly provided that sort of expertise no longer testified for defense teams.

In his brief, Davis points to several cases that allegedly demonstrate that an attorney who fails to hire a medical expert is ineffective. But a brief review of these cases shows that each is distinguishable from the present case. For example, in *Mullins v. State*,

13

30 Kan. App. 2d 711, 717-18, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002), counsel admitted that he never even considered hiring an expert because he believed it to be an uncommon practice. Here, counsel obviously considered hiring an expert; he simply failed to find one that fit the narrow specifications of the case. Similarly, in most of the federal cases Davis relies on, counsel completely failed to consult with or consider a medical expert. See *Gersten v. Senkowski*, 426 F.3d 588, 607-11 (2d Cir. 2005) (determining that counsel's failure to consult with a medical expert "essentially conceded" that the abuse occurred when the nature and extent of abuse on the young victim likely would have shown long-term damage); *Eze v. Senkowski*, 321 F.3d 110, 128-30 (2d Cir. 2003); *Holsomback v. White*, 133 F.3d 1382, 1385-89 (11th Cir. 1998). In this case, counsel not only looked into hiring an expert, but he recognized what an expert needed to be able to testify about:  namely, that the type of abuse that T.G. described would have left some kind of physical injury. And even the expert that Davis located recognized that lasting injury was not guaranteed. Moreover, each of the federal cases at issue involved younger children than T.G., and one of the three involved sexual abuse a male child. See *Gersten*, 426 F.3d at 592-93 (5-year-old girl assaulted until she was approximately 9); *Eze*, 321 F.3d at 113-14 (approximately 7-year-old girls); *Holsomback*, 133 F.3d at 1384 (4-year-old boy assaulted until he was approximately 9).

But more importantly, Davis has failed to demonstrate any prejudice. Despite his suggestion Barefoot or another expert like her would have secured him an acquittal, Barefoot's testimony actually does little to undermine the evidence presented at trial. Although Barefoot initially stated that she would have expected to find signs of physical trauma, she later acknowledged that the 6 days between the last assault and the exam butted up against the outer bounds of evidence availability. In fact, Barefoot's only real criticism of Thomas' report and examination concerned the lack of information about T.G.'s menstrual cycle, which—according to Barefoot's testimony—only really helps in determining the likelihood of injury to a victim. In other words, nothing in Barefoot's

14

testimony serves to undermine confidence in the result of the jury trial. For that reason, the district court's decision on this point should be affirmed.

*Failure to adequately investigate S.U. and Howell Solberg was not unreasonable.*

Next, Davis argues that his counsel failed to adequately investigate two potential witnesses: T.G.'s cousin S.U. and T.G.'s former stepfather Howell Solberg. As a preliminary matter, Davis based his December 2012 motion for new trial on what he considered an exculpatory affidavit from S.U. in which she claimed that Davis never photographed her or T.G. See *Davis II*, 2013 WL 4566450, at *2. These statements cut against the trial testimony of both T.G. and Davis, who each acknowledged that Davis had previously photographed T.G. and a cousin. 2013 WL 4566450, at *2. Both the district court and this court determined that the affidavit held little evidentiary value, as it did "not appear to contradict or materially conflict with what T.G. said" and the photographs constituted only "a minor aspect of the case." 2013 WL 4566450, at *2. In fact, this court "question[ed] whether S.U. properly could have been called as a witness at the trial" and determined that the affidavit was "not the sort of evidence that would have caused a jury to reverse course." 2013 WL 4566450, at *3. Given that this court fully considered the admissibility and relevance of any evidence S.U. could have provided, the doctrine of res judicata prevents us from considering it for a second time. See *Drach v. Bruce*, 281 Kan. 1058, Syl. ¶¶ 12, 14, 136 P.3d 390 (2006), *cert. denied* 549 U.S. 1278 (2007) (holding that the doctrine of res judicata applies to a K.S.A. 60-1507 movant who attempts to raise issues previously decided by an appellate court).

As for Solberg, counsel acknowledged that he remembered Davis mentioning that T.G. had previously lived with her stepfather. However, counsel testified that he did not believe that any of the evidence concerning how T.G.'s mother treated her children would be admissible. At the hearing, Solberg testified that years earlier, he sought a protection order on behalf of T.G. and her brother after their mother abruptly brought them to stay

15

with him. Solberg provided that his son (T.G.'s brother) told him a story that led him to believe that T.G.'s mother was having sex while the children were in the same general vicinity. But although a filing from the protection order case provided that credible evidence suggested that T.G.'s mother performed sex acts in front of the children, Solberg testified that he was unsure whether the children ever directly witnessed a sexual encounter.

Like with counsel's failure to obtain an expert, counsel's decisions in this regard were strategic. Counsel clearly testified that he did not believe that Solberg offered the defense any admissible evidence. But moreover, Davis presents no real argument for how counsel's failure to interview Solberg prejudiced him. Although Davis appears to argue that Solberg's testimony about the protection order would have provided an alternate source for T.G.'s advanced sexual knowledge, Solberg clearly provided that he did not know whether the children witnessed any sexual acts. In other words, even had counsel investigated and called Solberg, his testimony would not have added anything significant to the defense. As such, it cannot fairly be said that counsel was ineffective in this regard.

*Failure to request a jury instruction on spoliation of evidence was not unreasonable because such an instruction was not factually appropriate.*

Third, Davis contends that his attorney needed to request a spoliation instruction. Davis draws the language of this theoretical instruction from a concurrence in *Youngblood*, which provides: "'If you find that the State has . . . allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer the true fact is against the State's interest.'" 488 U.S. at 59-60 (Stevens, J., concurring).

As a preliminary matter, it is unclear from Davis' brief what evidence he believed warranted this instruction. Additionally, Davis provides no citation to any Kansas case involving this sort of cautionary instruction. But assuming that Davis is referring again to

16

the photographs from the sexual assault examination, it is obvious that this instruction is not applicable to the current case. In order for a reviewing court to find error in the failure to request a jury instruction, the defendant must demonstrate that the instruction was both legally and factually appropriate. See *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (outlining the two-step process for determining whether failing to give an unrequested instruction is error), *cert. denied* 135 S. Ct. 728 (2014). As alluded to earlier, neither the content nor the quality of the photographs are in dispute in this case. Thomas testified that T.G.'s examination revealed no injury; had they developed correctly, the photographs likely would have confirmed her expert opinion. Because the photographs would have been consistent with the testimony at trial, there is no reason to believe that the content or quality of the photographs were at issue, rendering the instruction inapplicable to Davis' case.

Moreover, in its decision, the district court expressly found that due to the lack of bad faith on the part of the State, it would not have given the spoliation instruction. While Davis insists that the district court's decision is based on a misinterpretation of the law, a review of our Kansas cases demonstrate that the instruction is limited to situations in which "the State has destroyed the evidence in bad faith." *State v. Romero*, No. 89,899, 2004 WL 1086967, at *4 (Kan. App. 2004) (unpublished opinion); see *State v. Garner*, No. 108,040, 2013 WL 4046409, at *5 (Kan. App. 2013) (unpublished opinion), *rev. denied* 299 Kan. 1272 (2014). As previously explained, Davis failed to show any bad faith on the part of the State. As such, his counsel did not act ineffectively by failing to request this instruction.

*Counsel adequately impeached T.G. with prior inconsistent statements.*

Next, Davis alleges that his counsel failed to adequately impeach T.G.'s trial testimony using her prior inconsistent statements. According to Davis, his counsel ignored "glaring and crucial discrep[a]ncies" when questioning T.G.

17

At trial, T.G. testified at length, detailing how Davis brought her into the bedroom after school, instructed her to undress, and assaulted her. During cross-examination, Davis' counsel impeached T.G. on several topics, including the timeline and specifics of the assaults. These questions revealed a number of inconsistencies between T.G.'s initial report in 2003 and her trial testimony in 2009. Counsel also questioned her about the parts of her testimony that had not been reported to law enforcement, such as the fact Davis forced her to watch pornography with him.

Like with other strategy decisions, "whether and how to conduct cross-examination . . . [is] the exclusive province of the lawyer after consultation with his or her client." *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007). That said, an attorney who declines to impeach the testimony of an important witness for the State may be ineffective. See *State v. Brooks*, 297 Kan. 945, 952-54, 305 P.3d 634 (2013) (holding that failure to adequately cross-examine the victim on a specific issue when the victim's credibility was "'all-important'" constituted ineffective assistance). But the failure to "more forcefully" press a witness is not ineffective when the jury is already clearly aware of the facts underlying that particular issue. *State v. Coones*, 301 Kan. 64, 77, 339 P.3d 375 (2014). Similarly, counsel's failure to ask more specific questions related to a witness' prior inconsistent statements is not ineffective when counsel discredits the witness in other ways. *Boldridge v. State*, 289 Kan. 618, 639-40, 215 P.3d 585 (2009).

In his brief, Davis points to a handful of inconsistent statements that counsel never highlighted, including T.G.'s earlier claims that Davis undressed her and that she never allowed Davis to force her to perform oral sex. These prior inconsistencies all stem from Lanning's interview of T.G.—an interview that the jury watched during Davis' trial. Obviously, the jury heard each of these inconsistencies, which in turn allowed it to weigh the credibility of her live testimony. Additionally, Davis' counsel clearly worked hard to discredit T.G., and he thoroughly questioned her on her timeline, the specifics of the assaults, and the new details she added at trial for the first time. While counsel clearly

18

missed a few individual inconsistencies, he obviously alerted the jury to a number of potential problems with T.G.'s account of the assaults.

More strikingly, Davis again fails to show any prejudice stemming from his counsel's questioning. Unlike in *Brooks*, where counsel declined to impeach the victim's statement about a scar even after the defendant alerted him that no such scar existed, none of T.G.'s testimony is so radically inconsistent from either her previous statements or reality as to undermine the confidence of the trial's outcome. See 297 Kan. at 953-54. In fact, T.G. admitted at trial that her memory of the assaults had faded since 2003, but she emphasized that she told Lanning and Thomas the truth. While the State's case certainly depended in large part on T.G.'s testimony, Davis fails to demonstrate how pointing a few minor inconsistencies out would have changed the outcome of his case. As such, his counsel was not ineffective on this point.

*Counsel's strategic decision not to object to inadmissible testimony by the State's witness was not unreasonable.*

Fifth, Davis argues that his counsel needed to object to a certain portion of Thomas' trial testimony. At trial, the State asked Thomas about her experiences examining child victims of sexual assault, including their "age appropriate awareness of . . . things of a sexual nature." Thomas testified that, to her, a 4-year-old child who demonstrated technical sexual knowledge likely "either physically experienced it . . . watched it . . . [or] have been exposed to that type of behavior in some way." Thomas also opined that a young child "shouldn't know" the details of ejaculation, but a child characterizing that act as "something [coming] out of his private part" (as T.G. described) suggested that the child witnessed it. But because the State designated Thomas as an expert witness, Davis contends that this common-knowledge testimony about age-appropriate sexual awareness was impermissible.

19

As a general rule, "[t]wo requirements must be present before expert testimony is admissible at trial. First, the testimony must be helpful to the jury. Second . . . the basis of [an expert scientific opinion] must be shown to be generally acceptable within the expert's particular scientific field." *State v. Hodges*, 239 Kan. 63, Syl. ¶ 1, 716 P.2d 563 (1986). Accordingly, "[e]xpert conclusions or opinions are inadmissible where the normal experiences and qualifications of lay persons serving as jurors permit them to draw proper conclusions from given facts and circumstances." *State v. McIntosh*, 274 Kan. 939, 956, 58 P.3d 716 (2002). In other words, expert witnesses can testify about conclusions that stem from their specialized knowledge but not about conclusions from common knowledge that is available to the jury. See 274 Kan. at 956.

Clearly, Thomas' statement that a 4-year-old child would not know the intricacies of sexual contact without somehow being exposed to it is common knowledge. But as Davis' counsel testified at the K.S.A. 60-1507 hearing, he did not believe objecting at that time would "keep any information away from this jury that would help propel our case." Counsel also testified that this decision was trial strategy. As previously mentioned, the court must strongly presume that counsel acted reasonably. See *Kelly*, 298 Kan. at 970. And given that Thomas both limited her testimony to discussing a 4-year-old child and acknowledged that a child could learn about sexual acts without actually experiencing them, it cannot fairly be said that counsel acted unreasonably by not objecting to this testimony.

*Davis fails to adequately present his claim that counsel failed to adequately cross-examine Lanning*

Finally, Davis alleges that his counsel performed only a "minimally adequate" cross-examination of Lanning. However, aside from a single sentence, Davis provides no details as to how his counsel could have improved his cross-examination or what purpose further questioning might have served. In other words, Davis failed to fully brief this

claim. A point raised incidentally but not argued is generally deemed abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). As such, we decline to consider this particular allegation of ineffectiveness.

In sum, Davis received effective representation from his trial counsel. All of counsel's alleged deficiencies amount to strategic trial decisions based on his knowledge of the case, the strictures of the applicable law, and practical considerations. And even if counsel failed to act reasonably in some instances, Davis has failed to demonstrate any prejudice stemming from his counsel's actions. In short, none of Davis' allegations undermine confidence in the outcome of his trial. Accordingly, the decision of the district court with regard to the effectiveness of trial counsel is affirmed.

EFFECTIVENESS OF APPELLATE COUNSEL

Next, Davis contends that his appellate counsel also provided inadequate representation. As with trial counsel, a defendant who challenges the effectiveness of his appellate counsel must demonstrate that (1) counsel's performance, based upon the totality of the circumstances, fell below an objective standard of reasonableness, and (2) the defendant was prejudiced to the extent that there is a reasonable probability the appeal would have been successful but for counsel's deficient performance. *Miller v. State*, 298 Kan. 921, 930-31, 934, 318 P.3d 155 (2014).

Both of Davis' appellate attorneys, Theresa Barr and Shawn Minihan, testified at the K.S.A. 60-1507 hearing. As a general matter, Barr did not recall a number of details about Davis' case, including the contents of the trial transcripts and what research she performed while writing the brief. She admitted considering Davis' letter about possible *Brady* violations but could not remember why she declined to raise them on appeal. And when Davis questioned her about a number of specific cases (often without context), Barr struggled to recall their holdings. However, she clearly testified that she would have

21

reviewed the full record and raised any issue she felt was appropriate, including the possible *Brady* violations. Overall, Barr believed that, based on her professional judgment, she presented the best arguments available at the time.

Minihan testified that he absorbed part of Barr's caseload, Davis' case included, when she left the Appellate Defender's Office. Minihan acknowledged receiving a letter from Davis about possible issues arising out of the State's brief, but he believed that filing a reply brief—which would have been out of time—was unnecessary. Minihan also explained that while he believed that Barr incorrectly briefed an issue, he likely would not have won a motion to withdraw and amend the brief. When asked about specific cases, he too struggled to provide their holdings, but he said he "would have been aware of the" general rule underlying some of them.

In terms of the incorrectly briefed issue, Minihan explained that he believed that Barr's multiple acts argument fell short because the State alleged specific dates. As such, Minihan attempted to transform the argument into something slightly different. In justifying this decision, he explained that appellate courts sometimes consider issues even when they are not perfectly preserved or briefed. Minihan also noted that because he raised the altered claim at oral argument, Davis received "a fighter's chance of winning on that issue."

In its decision, the district court found that "the appellate counsel were not ineffective in their representation." The district court specifically determined that no *Brady* violations existed, which in turn suggested that counsel was not ineffective for failing to raise those issues.

With all this in mind, Davis raises three separate allegations of appellate counsel's alleged ineffectiveness. Each will be addressed in turn.

22

*Davis fails to establish that appellate counsel had inadequate knowledge of applicable caselaw.*

First, Davis argues that counsel lacked adequate knowledge of the caselaw relevant to his appeal. Specifically, Davis points to the fact that neither attorney knew the holding from *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).

Preliminarily, Davis presents no real argument as to how *Olano* applies to this particular case. After all, *Olano*, 507 U.S. at 731-37, concerns the federal plain error rule and how it effects appellate jurisdiction. In the fact section of his brief, he briefly ties this holding to his argument about prejudice, but the overall relevance of the case remains unclear. But more importantly—and despite Davis' arguments to the contrary—Barr clearly testified that she researched relevant caselaw at the time of the appeal and raised the best arguments possible. Between this statement and the fact that Davis never explains how citing *Olano* would have bolstered his arguments, it cannot fairly be said that his attorneys acted ineffectively by not knowing the holding off the tops of their heads.

Davis also appears to argue that Barr's unfamiliarly with spoliation instructions rendered her ineffective. But as discussed above, a spoliation instruction was not appropriate in this case. As such, any appellate issue related to that instruction would have failed, and counsel did not act ineffectively by excluding it from the appellate brief.

*Davis fails to establish that appellate counsel incorrectly briefed the issue of prejudice.*

In his second and arguably most complicated issue, Davis contends that his counsel failed to properly grapple with the issue of prejudice in his appellate brief. According to Davis, the State's brief improperly suggested that he carried burden of

23

proving harmlessness on a certain issue, leading this court to find that the error did not prejudice him. See *Davis I*, 2011 WL 3795243, at *5.

Importantly, neither his nor the State's briefs from his direct appeal appear in the appellate record, which leaves open a number of questions as to how exactly Davis' attorneys treated the issue. As the appellant, Davis bears the burden of "designat[ing] a record that affirmatively establishes the claimed error"; without that record, this court will presume the trial court's action was proper. *State v. Auch*, 39 Kan. App. 2d 512, Syl. ¶ 6, 185 P.3d 935 (2008).

But even without the briefs, Davis' argument still fails. Presently, our Kansas law requires that the party benefitting from an error must prove that error is harmless. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013); *State v. Ward*, 292 Kan. 541, 568-69, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). But when Barr and the State each filed their briefs in Davis' direct appeal, the burden of proving harmlessness varied depending on the type of error asserted. See *State v. McCollough*, 293 Kan. 970, 982-83, 270 P.3d 1142 (2012); *Ward*, 292 Kan. at 557-69. And while *Ward*, which concerned the burden for constitutional error, was filed shortly before this court decided *Davis I*, the case establishing that the party benefitting from nonconstitutional error must prove harmlessness was not filed until the following year. See *McCollough*, 293 Kan. at 970; *Ward*, 292 Kan. at 541; *Davis I*, 2011 WL 3795243, at *1. This timeline of cases indicates that at the time the State filed its brief, the State could properly have suggested that Davis had the burden to prove harmlessness. Accordingly, counsel did not act ineffectively.

*Appellate counsel was not ineffective for failure to raise a* Brady *violation that did not exist.*

Last, Davis contends that his appellate attorneys acted ineffectively when they failed to argue that the State violated *Brady* by losing or destroying certain evidence. But as previously outlined, no *Brady* violations occurred. Nothing in the record suggests that the State acted in bad faith, that the evidence at issue was favorable to Davis, or that Davis suffered prejudice from its loss. Because Davis would not have succeeded on this claim, his counsel did not act unreasonably by not raising it.

In conclusion, then, Davis has failed to show that his counsel rendered deficient performance when perfecting his direct appeal. Moreover, he has not explained how counsel's alleged deficiencies prejudiced him. Accordingly, the district court's decision regarding the effectiveness of appellate counsel is affirmed.

CUMULATIVE ERROR

Finally, Davis argues that even if no single error justifies reversal, the cumulative effect of all errors requires that the district court's decision be overturned. When considering application of the cumulative error doctrine, this court must ask whether the totality of the circumstances establish that the errors caused substantial prejudice to the defendant and denied him or her a fair trial. In assessing the effect of any errors, this court examines them in the context of the entire record, considering how the trial judge dealt with the errors as they arose, the nature and number of errors and any interrelationship between them, and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). But a single error cannot constitute cumulative error, and this court will not apply the cumulative error doctrine when the record fails to support the errors alleged on appeal. *State v. Betancourt*, 299 Kan. 131, 147, 322 P.3d 353 (2014); *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014).

A thorough review of the record in this case reveals that no error occurred. Contrary to Davis' claims, the district court allowed him some ability to proffer about his witness' proposed testimony, and the transcript offers a fairly comprehensive view of the exact evidence the district court deemed inadmissible. Between the lack of bad faith and lack of prejudice, Davis failed to prove any *Brady* violations, and both trial and appellate counsel provided him with competent representation. Without any errors, this court cannot apply the cumulative error doctrine.

Affirmed.