NOT DESIGNATED FOR PUBLICATION

No. 115,437

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DALLAS TROY CLAYBORN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed September, 29, 2017. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GREEN, P.J., BUSER and LEBEN, JJ.


PER CURIAM:  Following a jury trial, Dallas Troy Clayborn was convicted of attempted aggravated robbery, aggravated assault, and criminal discharge of a firearm. Dallas appeals those convictions, arguing the following:  (1) his convictions must be reversed because the trial court erred by admitting K.S.A. 60-455 evidence at his trial; and (2) his convictions must be reversed because the State presented insufficient evidence to support his guilt at trial. For reasons stated below, we reject these arguments. As a result, we affirm Dallas' convictions.

1

On April 21, 2014, a black male wearing dark clothing and a white cloth around his face entered a Wichita, Kansas, convenience store called "the Phamily Express"; the man demanded money while wielding a gun. Anh Pham and his sister, Thuy Pham, were working at their store when this happened. Anh resisted the man's demands. The man responded by shooting at the Phams before fleeing the store without any money. Anh called the police, and the ensuing investigation resulted in the police recovering bullet casings and a long-sleeved white T-shirt, which matched the description of the cloth around the man's face. Later testing revealed that Dallas' DNA was on the long-sleeved white T-shirt. Later testing also established that the bullet casings matched a casing found inside a Wichita, Kansas, Subway restaurant following an armed burglary that occurred just two days after the Phamily Express crimes. Dallas was arrested for the burglary of the Subway, and he eventually pleaded guilty to that crime as well as criminal discharge of a firearm in that restaurant.

Based upon this evidence, the State charged Dallas with one count of attempted aggravated robbery of Anh, a severity level 5 person felony in violation of K.S.A. 2013 Supp. 21-5420(b)(1) and K.S.A. 2013 Supp. 21-5301(a), one count of aggravated assault of Anh, a severity level 7 person felony in violation of K.S.A. 2013 Supp. 21-5412(b)(1), and one count of criminal discharge of a firearm, a severity level 7 person felony in violation of K.S.A. 2013 Supp. 21-6308(a)(1)(A).

Before Dallas' jury trial, the State moved to admit evidence that Dallas had pled guilty to burglarizing a Subway restaurant as K.S.A. 60-455 evidence. The State asserted that Dallas' prior burglary was relevant in establishing his identity as the person who committed the Phamily Express crimes (1) because ballistics testing established that the same gun was used in the Phamily Express and the Subway crimes and (2) because both crimes occurred at night and within two days of one another. The trial court held a hearing on the State's motion where Dallas contested the probative value of the K.S.A. 60-455 evidence. Ultimately, however, the trial court granted the State's motion. Yet, the

2

trial court limited the State's admission of the K.S.A. 60-455 evidence, ruling that the State could only discuss the fact that Dallas had criminally discharged a firearm within the Subway but not the fact he had burglarized the Subway.

Dallas' jury trial occurred between November 2, 2015, and November 4, 2015. In addition to having Anh testify, the State had certain witnesses who saw a suspicious man near the Phamily Express. The only person who testified on Dallas' behalf was himself.

Sarah Fowler testified that on April 21, 2014, around 8 p.m., she was driving from her house which was located on the same street as the Phamily Express, when she saw a young, skinny, light-complexioned, black man walk between a business and an abandoned building. She testified that the man was wearing "black pants and a black zip-up hoodie, like jacket" with a "white T-shirt underneath and carrying [] a black, sling-over [athletic] backpack." Sarah explained that the man was about 30 to 40 feet from her when she saw him. She explained that the man was looking towards the direction of the Phamily Express and appeared to be "up to no good." She testified that she could not conclusively identify Dallas as the man she saw that evening but stated that Dallas did match the general description of the man she had seen.

Sarah's husband, Kaleb Fowler, testified that when Sarah was getting ready to leave, he was taking the garbage to the curb when he noticed a black man wearing dark colored clothing and carrying a backpack "with a string for the straps" by a business that was closed down the street. He testified that he believed the backpack had a Nike emblem on it. Kaleb explained that he noticed the man because "he was just hanging out in a kind of a conspicuous place." He said that the man walked across the street to some abandoned apartments that were directly behind the Phamily Express before he lost sight of the man.

Anh testified that around 8:30 p.m. he and Thuy were cleaning their store when a man came in and asked Thuy to put money in a bag he was carrying. Anh explained that

3

outside of noticing that the man had a "mask" on his face and that he thought the man was wearing jeans, he was not able to describe the man's appearance. He testified that even though the man had a gun, he told the man to get out of his store. He explained that when the man did not leave the store, Thuy ran to a back room to hide and he ran behind a shelf and began throwing bottles of soda at the man. He explained that the man responded by shooting the gun, so he ducked behind the counter. He testified that he believed the man shot at him about two or three times. He testified that after shooting the gun, the man left the store without any money.

Through Anh's testimony, the security footage from the Phamily Express store was admitted into evidence. The security footage showed that the man who attempted to rob Anh was wearing something white over his face and dark clothing on his body.

Mark Albright testified that around 8:30 p.m., he was sitting on the front porch of his sister's house, which was located about half a block from the Phamily Express, when he saw a skinny "black guy with a white mask on jump over the fence." He explained that he saw this man take some of his clothes off and put them in a barrel that was located next to the garage of an abandoned house near the Phamily Express. He further explained that the man was about 200 feet away from him when he put the clothes in the barrel. Mark could not describe the man's clothes, but he testified that after he took the clothes off, he "jumped back over the fence and took off down [an] alley." He testified that he thought the man seemed suspicious, so he walked over to the Phamily Express to see what was going on. He explained that he saw that the police were at the Phamily Express and told police what he had just witnessed. A police officer found some "black clothing and a white mask" next to the barrel. The clothing, which consisted of a black sweatshirt, black sweatpants, and a "white, long-sleeved T-shirt" with the sleeves tied as if it "could have been used as a mask" were admitted into evidence.

Amy McCowan, a crime scene investigator, testified about finding two bullet fragments, two bullet casings, a black Nike backpack, and three unfired bullets inside the Phamily Express. The casings and all of the bullets were 9-millimeter. The bullet fragment McCowan was able to retrieve from under a soda machine, the cartridge casings, the backpack, and the unfired bullets were admitted into evidence. Lori Scott, another crime scene investigator, testified about investigating a crime scene at the Subway on April 23, 2014. She explained that she collected one 9-millimeter bullet as well as three bullet fragments inside the Subway. Detective David Alexander, the lead detective in the Phamily Express case, explained that after he learned that Dallas had pled guilty to criminal discharge of a firearm in the Subway case, he requested that the bullet fragment and casings found inside the Phamily Express be compared to those found inside the Subway. The forensic scientist who compared the bullet fragments and casings testified that the bullet fragments and casings recovered from the Phamily Express and Subway were fired from the same gun.

In addition to his testimony on the bullet casings, Detective Alexander testified about interviewing Dallas as a potential suspect for the Phamily Express attempted robbery. He testified that during the interview, Dallas told him that on April 21, 2014, around 8:30 p.m., he would have been walking home from his girlfriend's house, which was just a few blocks away from the Phamily Express. He testified that during the interview, Dallas adamantly denied that he was missing any clothes. He also testified about obtaining a sample of Dallas' DNA for comparison to any DNA found on the long-sleeved white T-shirt with the knotted sleeves. A forensic scientist who compared Dallas' DNA to DNA found on the knotted sleeves testified that although DNA belonging to three different people was found on the knotted sleeves, Dallas had significantly more DNA on the knotted sleeves than the other DNA contributors. The forensic scientist explained that the probability that the DNA belonged to someone other than Dallas was 1 in 3.93 trillion.

5

Dallas explained that in April 2014, he was living with his mother but would also go over to his girlfriend's house. Dallas testified that when the attempted robbery at the Phamily Express happened, he was at his mother's house with his girlfriend watching movies. He admitted that he had told Detective Alexander that he had been walking home from his girlfriend's house, but he alleged that he had simply misremembered that fact during his police interview. He asserted that he did not even possess the gun used in the Phamily Express crimes when those crimes happened because he bought that gun from a man named "T.C." for $175 the day after the Phamily Express crimes. He admitted that he fired that gun inside the Subway the very next day, April 23, 2014. Last, Dallas testified that although he had told Detective Alexander that none of his clothes were missing, he had, in fact, left a sweaty long-sleeved T-shirt at a basketball court near the Phamily Express. Dallas then identified the long-sleeved white T-shirt with knotted sleeves as the shirt he had left by the basketball court.

The jury found Dallas guilty on all counts. Dallas was sentenced to a controlling term of 130 months' imprisonment followed by 24 months' postrelease supervision.

Dallas timely appealed.

*Did the Trial Court Err by Admitting the K.S.A. 60-455 Evidence?*

In *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 729 (2012), our Supreme Court outlined the three-step test courts must engage in while considering the admission of K.S.A. 60-455 evidence, with each having its own separate standard of review, as follows:

- "First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The

6

appellate court reviews this determination independently, without any required deference to the district court.

- "Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.

- "Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant. The appellate court also reviews this determination only for abuse of discretion."

Dallas argues that the trial court erred by granting the State's K.S.A. 60-455 motion, which allowed the State to introduce evidence that he had pled guilty to criminally discharging a firearm inside the Subway restaurant on April 23, 2014, just two days after the attempted robbery at the Phamily Express. Dallas concedes that the identity of the Phamily Express gunman was a material fact in dispute. Nevertheless, he contends that the evidence concerning his prior criminal discharge of a firearm conviction was not relevant in proving this material fact. Alternatively, he asserts that the evidence was more prejudicial than probative.

The State responds that Dallas has failed to preserve his challenge to the K.S.A. 60-455 evidence for appeal because, although Dallas argued that the trial court should not grant the State's K.S.A. 60-455 motion, he did not lodge a contemporaneous objection when this evidence was introduced at trial. Yet, Dallas clearly believes that his argument has been preserved for appeal. Without pinpointing in the record where he did so, Dallas has asserted that "defense objected to the court's ruling on the admissibility of the evidence relating to the Subway incident."

Under K.S.A. 60-404, however, unless there is a contemporaneous objection to the admission of evidence when it is admitted, "[a] verdict or finding shall not be set aside." Our Supreme Court has applied this rule even when considering challenges concerning the admission of K.S.A. 60-455 evidence. See, e.g., *State v. Beltz*, 305 Kan. 773, 776, 388 P.3d 93 (2017). As a result, Dallas needed to object to the K.S.A. 60-455 evidence when it was first admitted into evidence at his trial for his argument to be preserved for appeal. A review of the record on appeal, though, establishes that Dallas did not lodge a contemporaneous objection when the evidence was first admitted. At his trial, Scott, then Detective Alexander, and then the forensic scientist testified about Dallas' prior criminal discharge of a firearm conviction. Dallas did not object to Scott's testimony about his earlier conviction. And, Dallas did not object to Detective Alexander's or the forensic scientist's later testimony about his earlier conviction. In fact, Dallas lodged no objection to the admission of the K.S.A. 60-455 evidence at trial.

Consequently, by failing to lodge a contemporaneous objection, this court's ability to address Dallas' challenge concerning the admission of the K.S.A. 60-455 evidence is limited. Indeed, for this court to reach the merits of Dallas' argument, in his brief, Dallas must have established that one of the exceptions to the general rule that appellate courts do not consider arguments raised for the first time on appeal exists. *Beltz*, 305 Kan. at 776. This rule is consistent with our Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34), which requires appellants who raise arguments for the first time on appeal to explain why their arguments are properly before the court. Our Supreme Court in *State v. Godfrey*, 301 Kan. 1041, Syl., 1043, 350 P.3d 1068 (2015), warned that failure to comply with Rule 6.02(a)(5) amounts to abandonment.

Nevertheless, as already explained, Dallas has errantly asserted that his argument is properly before this court because he "objected to the court's ruling on the admissibility of the evidence relating to the Subway incident." We have been unable to find this objection in the record. The Seventh Circuit Court of Appeals appropriately stated:

8

"Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Rule 6.02(a)(5) requires a party show the location in the record on appeal where the issue was raised and ruled on. Here, Dallas has failed to do so.

In any event, despite Dallas' arguments to the contrary, his prior criminal discharge of a firearm conviction was relevant. Clearly, because Dallas admittedly had possession of the gun while committing criminal discharge of a firearm inside Subway just 2 days after the Phamily Express crimes, Dallas' possession of the gun inside Subway tended to prove that he was the man who committed the Phamily Express crimes. Thus, Dallas' criminal discharge of a firearm inside Subway conviction was relevant in establishing the identity of the man who committed the Phamily Express crimes. Next, regarding probative versus prejudicial value of the evidence, although the evidence was certainly prejudicial, the evidence was also highly probative. The fact ballistics established that the gun used in the Subway crime was also the gun used in the Phamily Express crimes, as well as the fact that those crimes happened within two days of one another, strongly supports Dallas' guilt. Moreover, the evidence of Dallas' earlier criminal discharge of a firearm conviction was particularly important given that none of the witnesses in the Phamily Express crimes could definitively say that the man they saw was Dallas. Instead, they could testify only that the man they saw matched the general description of Dallas.

As a result, the trial court did not abuse its discretion in determining that the evidence of Dallas' earlier conviction was relevant and more probative than prejudicial. Therefore, even if Dallas' argument had been properly preserved for appeal, it would fail.

*Was There Sufficient Evidence to Support Dallas' Convictions?*

When reviewing sufficiency of the evidence challenges, an appellate court reviews all of the evidence in the light most favorable to the prosecution. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). If a rational factfinder could have found the defendant guilty beyond a reasonable doubt, then an appellate court will uphold the defendant's convictions. 303 Kan. at 6. While engaging in this analysis, appellate courts must refrain from reweighing the evidence or making credibility determinations. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). Further, any offense can be supported entirely by circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

Dallas argues that there was insufficient evidence to support his convictions of attempted aggravated robbery, aggravated assault, and criminal discharge of a firearm. Dallas asserts that the only evidence linking him to the crimes committed by the man at the Phamily Express was "the fact that his DNA ([a]long with that of at least two other people) was found on a shirt that was associated with the crime) and [the fact] that he was in possession of the firearm used in the incident sometime after the crime occurred . . . ." Dallas emphasizes that "[n]either of these fact[s] put [him] at the scene of the Phamily Express incident." He also emphasizes that both the long-sleeved white T-shirt found beside the barrel near the Phamily Express and the gun that was fired inside the Phamily Express were portable items, meaning someone other than him could have used the shirt as a mask and used the gun to shoot at Anh. He concludes that although this evidence may raise a suspicion that he committed the attempted aggravated robbery, aggravated assault, and criminal discharge of a firearm, this evidence does not establish beyond a reasonable doubt that he committed those crimes.

Thus, in making his sufficiency of the evidence argument, Dallas does not dispute that somebody committed attempted aggravated robbery, aggravated assault, and criminal discharge of a firearm inside the Phamily Express. Instead, his only dispute is whether

enough evidence supports that he was the man who committed those crimes. Of additional importance, in making his argument, Dallas concedes that his DNA was on the long-sleeved white T-shirt with knotted sleeves and that he eventually possessed the gun used to commit the Phamily Express crimes.

Partly because Dallas has made the preceding concessions, the State counters that Dallas' argument is unpersuasive. The State emphasizes that the DNA and ballistics evidence was highly incriminating. The State further emphasizes that the testimony of Sarah, Kaleb, and Mark, which placed a man matching the general description of Dallas near the Phamily Express both before and after the crimes were committed, was very significant. Last, the State emphasizes that at one point, Dallas himself had stated that he was near the Phamily Express when the crimes at issue occurred.

Here, the State's analysis of the evidence against Dallas is clearly correct. For starters, even though the DNA and ballistics evidence did not definitively place Dallas at the Phamily Express when the crimes occurred, this evidence is still unbelievably damning. The portability of the shirt and the gun does not change the fact that the DNA and ballistics evidence constituted very strong circumstantial evidence supporting Dallas' guilt. And once again, even the most serious crimes may be supported by circumstantial evidence.

Next, Dallas' argument ignores that his conviction was supported by more than just the DNA and ballistics evidence. Sarah's and Kaleb's testimony each placed a man acting suspiciously, wearing dark-colored clothing, and matching Dallas' description on the same street as the Phamily Express just before the crimes were committed. According to Kaleb, this man had a black backpack with a Nike emblem on it, and a black backpack with a Nike emblem on it was left by the man who attempted to take money from Anh in the Phamily Express. Anh described this man as wearing a white mask; the security footage from his store confirmed this as well as the fact that the man was wearing dark

11

clothing. Mark testified that a man matching Dallas' description and wearing a white mask dumped the mask and some of the clothes he was wearing in a barrel outside the Phamily Express before running off down an alley. Police recovered a black sweatshirt, a pair of black sweatpants, and a long-sleeved white T-shirt with knotted sleeves, which looked like a makeshift mask, next to the barrel outside the Phamily Express. Thus, based upon the preceding, there was evidence outside of the DNA and ballistics evidence supporting Dallas' guilt.

Additionally, Dallas' argument ignores his own inconsistent statements. Once more, during his interview with Detective Alexander, Dallas denied having any missing clothing. He also told Detective Alexander that when the Phamily Express crimes occurred, he would have been in the area of the Phamily Express. While testifying at his trial, however, Dallas abandoned those statements, testifying (1) that he was at his mother's house when the crimes occurred and (2) that he had left a long-sleeved white T-shirt outside, which he believed to be the shirt the police recovered next to the barrel. Dallas even had an answer for why there could have been DNA on the shirt as he testified that it was sweaty when he took it off. In short, Dallas' inconsistent statements undermined his credibility. In turn, Dallas' absence of credibility supports that he was guilty of attempted aggravated robbery, aggravated assault, and criminal discharge of a firearm.

Considering the preceding evidence in the light most favorable to the State, we conclude that sufficient evidence supported Dallas' guilt of these crimes.

Affirmed.

12